# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2476

_____

Michael L. Schawitsch,      *

        *

     Petitioner-Appellant,      *

        *    Appeal from the United States

     v.          *    District Court for the

        *    Southern District of Iowa.

Jerry Burt, Warden,      *

        *

     Respondent-Appellee      *

_____

Submitted: December 11, 2006
Filed: July 6, 2007

_____

Before BYE, COLLOTON, and BENTON, Circuit Judges.

_____

BYE, Circuit Judge.

In 1999 a state court jury convicted Michael L. Schawitsch of robbing, on two consecutive days, a convenience store and a restaurant. Iowa state courts rejected Schawitsch's appeals. Schawitsch raised two grounds in his petition for federal habeas corpus relief: ineffective assistance of counsel for failure to object to improper cross-examination; and a factual finding that a photo lineup was not suggestive or supported by clear and convincing evidence. The district court[1] denied his petition.

_____

[1] The Honorable Robert W. Pratt, Chief Judge, United States District Court for the Southern District of Iowa.

We determine Schawitsch has not met his required burdens on neither issue on appeal and affirm the district court's judgment.

I

On February 6, 1999, at about 6:30 p.m., a man armed with a gun entered the Joy Mart convenience store in Keokuk, Iowa. He demanded money from the clerk, Renee Merydith. She gave him cash, and he left.

The next day, on February 7, 1999, a man entered the McDonald's restaurant in Keokuk through an unlocked back door at about 10:30 p.m. The man approached the front counter, displayed a gun, and demanded money from an employee, Michael Burchett. Two other employees, Mandy Hendricks and Rory O'Connell, were able to observe the man. The employees gave the man cash, and he left.

While the McDonald's robbery was taking place, an employee alerted a drive-through customer. The customer drove to the police station and relayed the information. Police officers quickly arrived at the scene and observed a white Chevrolet Corsica leaving the restaurant. The car did not bear any license plates. The driver led officers on a high-speed chase into Illinois. Officers were not able to stop the vehicle.

On February 8, 1999, a sawed-off shotgun was found along the escape route. Merydith and Hendricks identified the shotgun as similar to the one used in the robberies. In April 1999, blue jeans, two bank bags marked McDonald's, another bank bag, and $1,098 in cash were found hidden under a boat near the escape route. No identifiable fingerprints were found on any of the items.

Police officers received information about Michael Schawitsch owning a car similar to the one observed during the McDonald's robbery. Officers prepared a color

photographic lineup of six individuals, including Schawitsch.  Merydith, Hendricks, and O'Connell all identified Schawitsch by a photograph as being the robber.  Burchett was unable to make a selection from the photographic lineup.

During the identification processes, police did not say whether the robber was in the photo array.  When Merydith picked Schawitsch out of the photo array, both police officers present clapped their hands and one said something akin to "Yeah, baby."

The other photos in the array were not perfect matches for Schawitsch.  One witness had described the robber as having hair down to his mid-neck.  None described the robber as having had facial hair, or wearing glasses.  The six photos in the array pictured:

1) a man with shoulder-length hair, facial hair, and glasses;
2) a man with short hair and facial hair;
3) a man with shoulder-length hair;
4) a man with shoulder-length hair and facial hair;
5) a man with short hair;
6) Schawitsch, with short hair, no facial hair, and no glasses.

The only photo prison officials had of Schawitsch was of him in his prison garb; the other five men pictured were dressed similarly.  Schawitsch's picture had very clear height markings on the wall behind him; none of the other photos had such clear markings.

At trial, Schawitsch's former girlfriend, Christine Jordan, testified she had owned a white Corsica.  In February 1999, after Jordan and Schawitsch separated, he had the vehicle in his possession.  Jordan removed the license plates from the car and signed the title over to him.  The vehicle was left at an auto body shop in April 1999.  Later, an unidentified female called and told the shop owner to junk the vehicle.  The owner of a salvage yard in Illinois testified he took possession of a white Corsica in

-3-

August 1999.  When he received the car, the title was in the name of "Michael Savanawitsch."  Also, one of his pay stubs was found in the vehicle.

Schawitsch testified as to February 6, 1999, and the fact he spent the evening at the home of his brother, Kevin Schawitsch, and the next day, Kevin and Kevin's girlfriend, Lora Aden, drove him to his mother's house.  His mother testified he was at her house on the evening of February 7.   Aden's testimony also supported Schawitsch's.

During the trial, Schawitsch took the stand and was aggressively cross-examined by the prosecutor.  Schawitsch's counsel cites these exchanges as relevant:

Q: Well, you've heard Deanna Howe's[2] testimony, didn't you?
A: Sure.
Q: What – do you have any reason to believe that she would have some motivation to come in here and fib to the jury about these events?...
Q: And Deanna Howe is lying to the members of the jury? . . .
Q: Why wouldn't she recall that? . . .
Q: She would have to be making that up if it is not true, doesn't she?...
Q: So tell me why she would do that? . . .
Q: She is also making up testimony to tell this jury that she saw you operating that vehicle on occasions in January and February 1999?
. . .
Q: And Mandy Hendricks' identification of you is a fabrication? . . .

_____

[2] Deanna Howe testified she went to Kevin Schawitsch's house and signed Schawitsch's name to transfer title of the Corsica from Jordan to Schawitsch on February 5, 1999.  She also testified she saw Schawitsch drive the car the week before.

Q: Would you agree with me that if the witnesses here in Keokuk are telling the truth, your mother is most certainly lying? . . .

Q: I want you to assume that the witnesses, if we assume just for argument, that Mandy Hendricks, Renee Merydith and Rory O'Connell are testifying truthfully, your mother is almost certainly lying? Is she not?

Iowa State University professor Gary Wells testified he had assisted the U.S. Department of Justice in promulgating national guidelines for law enforcement agencies to follow during eyewitness identifications. The photo array police used in this case, Wells testified, did not meet these guidelines. He noted it was especially critical to tell a witness the person who committed the crime might not be present in the array.

The jury convicted Schawitsch of two counts of first-degree robbery, two counts of possession of an offensive weapon, and one count of first-degree burglary. The Iowa district court sentenced him to two consecutive twenty-five-year terms on the robbery convictions, with a concurrent five-year term on each possession conviction, and a concurrent twenty-five-year term on the burglary conviction, for a total of fifty years.

Schawitsch appealed to the Iowa Court of Appeals, which affirmed. The Iowa Supreme Court denied review. He sought post-conviction relief, which the state district court, court of appeals, and supreme court all denied.

In the habeas proceedings, the federal district court denied Schawitsch's petition, holding the Iowa court's photo lineup ruling to be a reasonable application of Manson v. Brathwaite, 432 U.S. 98, 114 (1977). The district court also held as procedurally defaulted his claim of ineffective assistance of trial counsel for not objecting to certain questions on cross-examination because he had not "fairly

presented" it to the Iowa courts and had not shown cause to excuse the default. This appeal followed.

## II

This petition was filed after the April 24, 1996, effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA); consequently, the petition is governed by AEDPA. See Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under AEDPA, habeas relief is warranted only if adjudication on the merits of a constitutional claim by the state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's factual findings are presumed correct unless a petitioner shows otherwise by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). We review a district court's finding of procedural default *de novo*. Kerns v. Ault, 408 F.3d 447, 449 (8th Cir. 2005).

## III

Clearly established Federal law, as determined by the Supreme Court of the United States, requires a two-step inquiry into photographic arrays. Manson, 432 U.S.

-6-

at 114. The first step is to determine whether the array was impermissibly suggestive. If found so, the second inquiry is whether under the totality of the circumstances the array created a substantial risk of misidentification at trial.

When there are no differences in appearance tending to isolate the accused's photograph, the identification procedure is not unnecessarily suggestive. United States v. Mays, 822 F.2d 793, 798 (8th Cir. 1987); see also United States v. Wilson, 787 F.2d 375, 385 (8th Cir. 1986) (photo spread not unnecessarily suggestive where suspect was the only Hispanic included in the display).

To determine whether a photo array creates a substantial risk of misidentification at trial, the court considers: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003) (citing Manson, 432 U.S. at 114).

Schawitsch argues the color photo array was impermissibly suggestive because many of the other men pictured in the array did not match witnesses' descriptions of the robber. Hendricks described the robber as "almost sickly-looking skinny"; Burchett described him as very thin. (Within the array were photos of men with thin to medium builds.) Merydith described the robber as having light brown hair to the middle of his neck, and Burchett described him as having dirty black hair, turning gray, running to the middle of his neck. (Within the array were at least three photos of men with hair to or beyond the neck and shoulders.) Police attempted to include photos of men between 5'8" and 6'1", but Schawitsch's photograph was the only one with detailed height markings in the background. No witness mentioned the robber as wearing glasses; one man pictured in the array did wear glasses. And after Merydith chose Schawitsch's photo from the array, officers reacted very positively.

In reviewing the photo array, the Iowa Court of Appeals found that although there were differences in the photos, "it appears there was at least a reasonable effort to harmonize the photographs." Police officials, not wanting Schawitsch's orange prison jumpsuit to stand out, had tried to find photographs of reasonably similar-looking men who were also wearing orange jumpsuits.

The court went on to find that even if the array were impermissibly suggestive, Schawitsch did not demonstrate a substantial likelihood of irreparable misidentification. Merydith and Hendricks identified him from the photo array after seeing the robber close-up during the incident. They had both seen the robber at close range, paid close attention during the crime, and were certain he was the robber. O'Connell, who had seen the robber from the back of the McDonald's restaurant, was also able to identify him as the robber. And since the officers' encouraging remarks to Merydith came *after* she chose him from the array, they did not influence her initial choice.

We agree. There were no differences in the photographic lineup that isolated Schawitsch. Reasonable variations in hair length and facial hair are not impermissibly suggestive, especially as they can vary on any given person at different times. The identification procedure was not unnecessarily suggestive, nor did it bear a substantial risk of irreparable misidentification at trial.

As such, it cannot be said the decisions of the state courts with regard to the photographic array were contrary to, or involved an unreasonable application of, clearly established Federal law, nor were they unreasonable determinations of the facts.

## IV

During his cross-examination of Schawitsch, the prosecutor asked him to comment on the truthfulness of some of the government's lay witnesses. Trial counsel did not object. On direct appeal, he was represented by the same counsel, who did not argue he had been ineffective at trial, nor under Iowa law should he have been expected to do so. See Bear v. State, 417 N.W.2d 467, 472 (Iowa Ct. App. 1987) (holding it is not reasonable to expect trial counsel to raise his or her own ineffectiveness on appeal).

In post-conviction proceedings, Schawitsch was represented by new counsel. This new counsel did not raise an ineffective assistance claim at the state level, and raised such a claim only in his petition for federal habeas relief. His impetus was the Iowa Supreme Court's decision in State v. Graves, 668 N.W.2d 860 (Iowa 2003), issued about two months after the Iowa Court of Appeals' decision in his case. In Graves, the court held it was improper under Iowa law for a prosecutor to ask a defendant whether another witness was lying ("'[W]ere-they-lying' questions are improper under any circumstance." Id. at 873).

The district court, without reaching the merits, found Schawitsch's ineffective assistance claim to be procedurally defaulted because it had not been raised on the state level, and held the default not cured by any "cause and prejudice" or "miscarriage of justice" (citing Coleman v. Thompson, 501 U.S. 722, 749-50 (1991)).

Schawitsch argues the default should be excused because either 1) the Graves case constituted "new law," was thus unavailable to his previous counsel, and he deserves a new trial, or 2) the elements of Graves were available to his previous counsel, who ignored them, constituting ineffective assistance.

The district court correctly held <u>Graves</u> did not represent a change in Iowa law and therefore could not be characterized as "new law." In <u>Graves</u>, the Iowa Supreme Court noted the issue had been raised in two cases prior to Graves's trial in 2002. <u>Graves</u>, 668 N.W.2d at 882 (citing <u>State v. Bayles</u>, 551 N.W.2d 600, 610 (Iowa 1996), and <u>State v. Rutledge</u>, 600 N.W.2d 324, 325 (Iowa 1999)). Accordingly, trial counsel in <u>Graves</u> had a duty to object to the prosecutor's cross-examination, as did Schawitsch's trial counsel in 2000.[3]

The district court also correctly held the actions of direct-appeal and post-conviction counsel cannot constitute "cause" to excuse a procedural default, unless that claim has been adjudicated in state court, which Schawitsch did not do. <u>See</u> <u>Taylor v. Bowersox</u>, 329 F.3d 963, 971 (8th Cir. 2003) (holding exhaustion doctrine requires claim for ineffective assistance of direct appeal counsel be initially presented to state courts as an independent claim before it may be used to establish cause for a procedural default in federal habeas proceeding).

Because we find Schawitsch's default has not been cured, we need not address whether his challenge would withstand analysis under AEDPA, or the prejudice prong of <u>Strickland v. Washington</u>, 466 U.S. 668, 694-95 (1984).

V

For the foregoing reasons, we affirm the district court.

_____

_____

[3]Even had <u>Graves</u> created "new law," trial and appellate counsel cannot be found ineffective based on their failure to anticipate such a future development. <u>See</u> <u>Parker v. Bowersox</u>, 188 F.3d 923, 928 (8th Cir. 1999) ("We have repeatedly held that such a failure does not constitute ineffective assistance" (citations omitted)).