**UNITED STATES of America,**
**Plaintiff,**

v.

**Ever David GRANADOS, Defendant.**

**No. Cr. 08–30052–02–KES.**

United States District Court,
D. South Dakota,
Central Division.

Nov. 4, 2008.

Timothy M. Maher, U.S. Attorney's Office, Pierre, SD, for Plaintiff.

David W. Siebrasse, Pierre, SD, for Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

KAREN E. SCHREIER, Chief Judge.

Defendant, Ever David Granados, is charged with one count of conspiracy to distribute and possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. Docket 1. He moves to suppress all evidence obtained following the entry and search of his hotel room and his father's vehicle on June 14, 2008, all statements made to law enforcement agents on June 14, 2008, and testimony concerning a photo lineup conducted by law enforcement agents on June 16, 2008. Docket 39.

The court referred the motion to suppress to Magistrate Judge Mark A. Moreno pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge recommends that this court deny Granados' motion to suppress. Granados objects to the magistrate judge's factual and legal findings supporting his conclusion that officers had probable cause to arrest Granados and that exigent circumstances justified the warrantless entry into Granados' hotel room to arrest him. Granados also objects to the magistrate judge's finding that he voluntarily consented to the search of his hotel room and his father's vehicle. Granados further objects to the magistrate judge's recommendation that his statements to law enforcement officers not be suppressed. Finally, Granados objects to the magistrate judge's finding that there were no differences in appearance in the photo lineup that tended to isolate the picture of Granados. Docket 51. The government has no objection to the magistrate judge's report and recommendation.

## STANDARD OF REVIEW

The court must make a de novo review "of those portions of the [Magistrate's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also United States v. Lothridge*, 324 F.3d 599 (8th Cir.2003); *Jones v. Pillow*, 47 F.3d 251, 253 (8th Cir.1995). 28 U.S.C. § 636(b)(1) requires that when a party objects to the report and recommendation of a magistrate judge concerning a disposi-

tive matter, "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.; see also* Fed.R.Civ.P. 72(b). After a de novo review of the magistrate judge's report and recommendation and a review of the record, the court adopts the report and recommendation of the magistrate judge as supplemented herein.

## DISCUSSION

### I. Background

Granados' motion to suppress arises out a controlled delivery of cash involving a confidential informant (CI). On June 14, 2008, officers learned that the CI would be meeting his alleged source of marijuana, Gonzalo Morales, at the Kelly Inn in Pierre, South Dakota, to give Morales money owed for a previous delivery of marijuana. A task force of FBI agents and Pierre Police Department officers (the task force) observed the CI and Morales meet in a Ford Expedition in the Kelly Inn parking lot. When the CI and Morales exited the Expedition, members of the task force arrested Morales, went to Granados' hotel room, entered without a warrant, and arrested Granados. Agents later searched the hotel room and vehicle and questioned Granados pursuant to written consent forms signed by Granados. A photo array containing Granados' picture was presented to the CI on June 16, 2008. The court will discuss the facts in more detail as they relate to Granados' specific grounds to suppress evidence and statements.

### II. Warrantless Entry and Arrest

Granados objects to the magistrate judge's finding that probable cause and exigent circumstances justified the warrantless entry into Granados' hotel room and the arrest of Granados. Granados argues with each of the facts the magistrate judge set out in support of his conclusion. The court has conducted a de novo review of the record and determines that the evidence supports a finding of probable cause and exigent circumstances. As a result, it is unnecessary for the court to address many of Granados' disagreements with the magistrate judge's factual findings, but the court will address Granados' objections that relate to facts and evidence relied on by the court.

### A. Events Leading to Warrantless Entry and Arrest

After learning from the CI that Morales was traveling to Pierre to collect payment, the task force held a briefing meeting to plan surveillance of the controlled delivery. The task force believed that another person was involved on Morales' side of the transaction. The CI had previously informed Division of Criminal Investigation Agent Jason Baldwin that Morales had worked with several other individuals in the past. Further, in the first of two FBI-monitored phone calls between the CI and Morales earlier that day, Morales spoke as if another person were traveling with him. Morales twice told the CI, "we will wait for you" at the hotel. Morales also stated that it would be better if "we go get the [hotel] room" and that he would tell the CI "where we're at" after getting the room. Near the end of the conversation, he confirmed that "we'll" get the hotel room. The task force planned to arrest Morales' associate as soon as possible after the CI and Morales completed the transfer of money and exited the vehicle. The task force also discussed safety concerns in the upcoming transaction. The CI indicated that Morales had been seen with three guns and a knife in the past and had visited the CI's family looking for his money.

After the briefing meeting, Detective Troy Swenson and Special Agent Guy DiBenedetto set out to locate the vehicle Morales was traveling in. They observed a green SUV with out-of-state license plates traveling north on Highway 83 through Fort Pierre. They conducted a license check and learned that the vehicle was registered to David Granados of Albuquerque, New Mexico. Swenson testified that he could not see how many people were in the vehicle, but DiBenedetto testified that he could see at least two people. Granados argues that the officers' testimony is contradictory. But the court finds that because Swenson and DiBenedetto viewed the vehicle from different vantage points, the testimony of one that he could not see how many people were in the vehicle is not inherently contradictory with the testimony of the other that he could see two people. Although the testimony differs, it is not contradictory, and the credibility of both officers remains intact.

The task force set up surveillance at the Kelly Inn and observed the CI and Morales enter and hold a meeting in the Expedition, which was the same vehicle that Swenson and DiBenedetto had observed driving in Fort Pierre. The task force used an electronic transmitting device to listen in on and record the CI and Morales' conversation. Morales again spoke in the plural. He indicated that while he needed rubber bands to sort and separate the cash, "we take even ones." Later, he indicated that he wanted more buyers, saying "[w]e've got to do it." He explained that "this guy, my brother, and I are working

together." He went on, "[t]he more we do is better. Right now we are starting.... We need more people every time." At the end of the conversation, Morales told the CI to call him when the person with the rest of the money arrived: "[t]hat way we are ready for you to be back." When the CI and Morales exited the vehicle, Morales was arrested and the CI was escorted from the scene. No drugs or weapons were found on Morales.

Immediately after arresting Morales, members of the task force went to Room 250, the room Morales had told the CI he was staying in. A member of the task force obtained a key to Room 250 from the Kelly Inn front desk. Special Agent James Van Iten testified that he smelled burnt marijuana in the hallway near Room 250, but he was not able to determine from where the smell came. Swenson testified that the odor was very strong in front of Room 250.[1] When officers reached Room 250, the door to the room was closed. Swenson used the key card to open the door and enter the room without knocking. The officers handcuffed Granados and took him to a squad car in a secure area. Officers did not have a search warrant for the hotel room, an arrest warrant for Granados, or consent to enter the hotel room.

Van Iten testified that the task force entered Room 250 immediately after arresting Morales rather than securing the room and obtaining a search warrant based on safety concerns. Morales had been seen with firearms and a knife in the past, and the task force was concerned

---

1. Granados argues that it is questionable from Swenson's testimony whether he perceived the strong odor of marijuana near Room 250 before he opened the door or after he had already entered the room. The court finds Swenson's testimony clear that the odor of marijuana was evident in the hallway and stronger outside the closed door of Room 250. Further, the fact that Van Iten was unable to determine where the odor was coming from does not undermine Swenson's credibility. Swenson spent more time in the hallway before entering Room 250 than did Van Iten because Swenson was the first officer to reach Room 250 and Van Iten was fourth in line. Therefore, Swenson was in a better position to determine the source of the odor.

that Morales' associate in the hotel room would witness or receive a signal that Morales was arrested. Baldwin testified that he was concerned about safety because the suspects were unknown individuals, Morales had located the CI's family, and the controlled transfer took place on a Saturday evening while hotel patrons and employees were moving about in the hotel and parking lot and numerous civilians were watching a motorcycle event outside.

### B. Granados' Hearsay Objection

Granados objects to the following evidence on hearsay grounds: information relied upon in the briefing meeting, testimony regarding text messages between Morales and the CI, and the statements made by them on the telephone and in the Expedition. It is unclear whether Granados objects to the introduction of hearsay evidence at the suppression hearing or to the task force's use of hearsay evidence to justify the warrantless entry and arrest. In either case, Granados' objection is unavailing.

 At a suppression hearing, the court may rely on hearsay evidence that would not be admissible at trial. *United States v. Thompson,* 533 F.3d at 964, 969 (8th Cir.2008); *see also* Fed.R.Evid. 104(a) (stating that the court "is not bound by the rules of evidence except those with respect to privileges" when determining whether evidence is admissible during suppression hearing). Further, probable cause determinations generally may be based on hearsay. *United States v. Leppert,* 408 F.3d 1039, 1042 (8th Cir.2005). When probable cause is based on statements by an informant, the critical inquiry is the informant's reliability. "An informant's tip may be sufficiently reliable to support a probable-cause determination if the informant has previously provided reliable information or if the tip is corroborated by independent evidence." *Id.* at 1041 (internal quotation

omitted). Tips from an informant are entitled to greater weight where they include an "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand" or include statements against the informant's penal interests. *Id.* at 1042.

 Here, the probable cause to arrest Granados was based in part on statements from the CI. The court finds that the information provided by the CI was reliable. The CI's information that Morales and an unnamed associate were traveling to South Dakota to collect a drug debt was corroborated by the recordings of the phone conversations between Morales and the CI and the fact that Morales actually met with the CI at the Kelly Inn. The CI's statements about past encounters with Morales and his associates were reliable because the CI was involved in the interactions and therefore observed them firsthand and because his description of the drug transactions implicated himself in criminal activity. The CI's statement that Morales had visited his family to seek payment of the drug debt was corroborated by the fact that Morales contacted the CI and drove to South Dakota to collect the money. Finally, the evidence of statements made by Morales and the CI during the controlled transfer in the Expedition was reliable because the task force listened in on the conversation as it was happening. The information provided by the CI was reliable enough to support a finding of probable cause and was properly considered by the magistrate judge.

### C. Legality of the Entry and Arrest

 Officers may not effect a warrantless arrest of a suspect in his hotel room unless the arrest and entry are supported by probable cause and exigent circumstances. *United States v. Clement,* 854 F.2d 1116, 1118–19 (8th Cir.1988).

The court determines the existence of probable cause by looking at the "totality of the circumstances as set forth in the information available to the officers at the time of arrest." *United States v. Kelly*, 329 F.3d 624, 628 (8th Cir.2003). "The ... court may consider the collective knowledge and information of all the officers involved." *United States v. Marin–Cifuentes*, 866 F.2d 988, 990 (8th Cir.1989) (internal quotation omitted). "[P]robable cause existed at the time of the arrest where the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested." *Kelly*, 329 F.3d at 628. The Eighth Circuit has found exigent circumstances where a warrantless entry is necessary to protect the lives of individuals, to prevent a suspect from escaping, or to prevent the destruction of evidence. *Clement*, 854 F.2d at 1119.

The court finds that both probable cause and exigent circumstances existed when members of the task force entered Room 250 and arrested Granados without a warrant. At that time, agents knew that an unidentified third person had traveled from out of state with Morales, who had just been arrested for receiving over $3,000 in payment for a past delivery of marijuana. The following facts gave officers reason to believe that a third person was traveling with Morales and was involved in Morales' drug activity: the CI reported that he had interacted with at least one other person while conducting drug transactions with Morales in the past; while driving to Pierre, Morales told the CI that "we" will get a hotel room and wait for the CI there; DiBenedetto saw two people in the vehicle Morales was traveling in; the vehicle was registered to a person of the name "David Granados;" and Morales stated to the CI during the controlled transaction in the Expedition that "we" take one dollar bills, "we" are just starting out in the business and need more people, and that the CI should call when the person with the rest of the money arrived so that "we are ready for you to be back." Further, as members of the task force approached Room 250, they smelled burnt marijuana in the hallway. At least one detective perceived the odor to be stronger right outside Room 250.

"The cumulative effect of this information provides a more than adequate basis for finding probable cause." *Kelly*, 329 F.3d at 628. The facts that a third person had traveled to South Dakota with a known drug trafficker and was possibly waiting in the hotel room, that a third person owned the vehicle in which a transaction of drug money had taken place, that a third person had been involved in Morales' drug transactions in the past, and that the odor of burnt marijuana emanated from Room 250 are sufficient to warrant a person of reasonable caution to believe a person who may have been in Room 250 was involved in the distribution of marijuana.

Granados argues that the task force lacked probable cause to arrest him because it did not have any information linking him specifically to the drug trafficking, weapons, and contact with the CI's family. He asserts that the evidence does not show that he was involved in the transaction between Morales and the CI or that he knew that Morales was traveling to South Dakota to collect a drug debt. Granados also argues that any reference to "we" by Morales logically referred to Morales and his brother. These arguments go to the sufficiency of the evidence against Granados on the charges against him, not to whether the officers had probable cause to enter the hotel room and arrest Morales' suspected associate. The task force did not need to know the identity of the person traveling with Morales for there to

be probable cause that the person was involved with drug trafficking. Taken as a whole, the facts known to the members of the task force were sufficient for the officers to reasonably believe that the individual traveling with Morales, be he Morales' brother or an unknown person, was knowingly involved in a conspiracy to distribute marijuana.

Exigent circumstances also supported the warrantless entry into Granados' hotel room. The task force reasonably believed that it was necessary to immediately arrest the person traveling with Morales to protect public safety. Morales was known to have had guns and a knife in the past, and no weapons were found on his person or in the Expedition after he was arrested. Morales had located and visited the CI's family seeking payment for a past delivery of marijuana. The controlled transaction took place on a Saturday evening while hotel guests and employees were moving about the hotel and parking lot and civilians were sitting alongside the street near the Kelly Inn to watch a motorcycle event. Further, based on the facts set out above, members of the task force had reason to believe that a third person was traveling with Morales and was waiting for him in Room 250. It was reasonable to assume that the third person may have been watching the transaction and arrest from his hotel room or was alerted by Morales' failure to return with the money that something had gone wrong. See United States v. Padilla, 869 F.2d 372, 379–80 (8th Cir.1989) (arrestee's failure to communicate with suspect may have signaled that the deal had gone sour). The task force was justified in entering Granados' room without a warrant because of its reasonable belief that it was necessary to protect the general public, hotel guests and employees, the CI's family, and the officers and agents themselves from a possible violent action from Morales' associate.

Granados argues that there was no special urgency for the task force to enter Room 250 without a warrant because the only evidence linking Morales to weapons was one year old, there was no evidence that Morales had threatened anyone with weapons, Morales had already been arrested when the entry occurred, and there was no evidence that Granados had been in contact with the CI or his family. These facts do not detract from the task force's reasonable belief that Morales may have left weapons in his room, that Morales' associate may have known the location of the CI's family, and that Morales' associate may use his own weapons against officers, civilians, or the CI's family after realizing that Morales had been arrested after a meeting with the CI.

The warrantless entry into Granados' hotel room was also necessary to prevent him from fleeing. The Eighth Circuit has consistently recognized that "the timing of undercover drug transactions makes the simultaneous arrest of all conspirators a matter of special urgency." Padilla, 869 F.2d at 379. This is because the failure of the arrestee to communicate with his co-conspirators after a planned drug transaction or to return with the drugs or money can signal to the co-conspirators that the deal has gone sour. Id. at 379–80; see also Clement, 854 F.2d at 1119–20 (agents reasonably inferred that the occupants of a hotel room expected their associates to return with the proceeds of an earlier drug sale and the nonappearance of the associates might warn the occupants that the sale had failed). In this case, the agents could reasonably infer that Morales' failure to return to the hotel room with the money within a reasonable period of time would alert the person in the room that something had gone wrong with the transaction. Therefore, they were justified in entering the hotel room to prevent Granados from fleeing. See Marin–Cifuentes, 866 F.2d at

992 (finding that it would have been foolhardy of officers not to arrest known suspect immediately after arrest of associates involved in controlled sale to avoid the chance of flight).

■ Because probable cause and exigent circumstances supported the warrantless entry into Granados' hotel room and his arrest, the court adopts the recommendation of the magistrate judge that the entry and arrest did not violate the Fourth Amendment. The court also adopts the recommendation of the magistrate judge that the unannounced entry did not violate the knock and announce requirement imposed by 18 U.S.C. § 3109 because exigent circumstances justified the entry. *See Padilla*, 869 F.2d at 380 n. 4 (explaining that the exigent circumstances exception applies to § 3109 because the exception existed at common law). Finally, the court finds that the evidence obtained through the search of the hotel room, the search of the Expedition, and the questioning of Granados is not inadmissible as fruit of the poisonous tree because the entry and arrest were not unlawful.

## III. Search of Hotel Room and Vehicle

■ Granados objects to the magistrate judge's recommendation that he voluntarily consented to the search of Room 250 and the Expedition. After members of the task force entered Granados' hotel room, he was handcuffed and escorted to a squad car. Van Iten informed him that he was under arrest and requested consent to search the hotel room and Expedition. Granados signed a consent to search form and initialed next to the areas to be searched. The form also contained typewritten statements that the signatory had been advised of his right to refuse consent, gave permission voluntarily, and authorized agents to take any items which they determined to be related to their investigation. Granados did not initial next to

these statements, and Van Iten does not remember whether he went over each line individually with Granados. Van Iten did not tell Granados it would be beneficial if he gave consent nor did he promise leniency if he did so, and he does not recall if he told Granados he would notify the prosecutor of his cooperation. Granados was handcuffed throughout the conversation, except when he signed the consent form. He spoke in English, did not appear to have any problems understanding Van Iten, and did not appear to be under the influence of drugs. At no point did Granados indicate that he did not want agents to search his hotel room or vehicle. Officers searched both locations without a search warrant.

■ Under the Fourth Amendment, a warrantless search is presumptively unreasonable unless one of the well-established exceptions applies. *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir.2005). Knowing and voluntary consent to a search is one of these exceptions. *Id.* "The test applied to determine if consent is free and voluntary is whether, in light of the totality of the circumstances, consent was given without coercion, express or implied." *United States v. Escobar*, 389 F.3d 781, 784–85 (8th Cir.2004) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). The government must prove voluntariness by a preponderance of the evidence. *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir.1990).

■ In determining whether consent was freely and voluntarily given, courts consider the following facts about the defendant: (1) age, (2) general intelligence and education, (3) level of intoxication, (4) whether he was informed of his right to withhold consent or of his *Miranda* rights, and (5) experience with prior arrests that made him aware of the legal rights of

suspected criminals. *Id.* at 381. Courts also consider the environment in which consent was given by determining whether the defendant: (1) was detained and questioned for a long or short time, (2) was threatened, physically intimidated, or punished by the police, (3) relied upon promises or misrepresentations made by the police, (4) was in custody or under arrest, (5) was in a public or secluded place, or (6) objected to the search or stood by silently while the search occurred. *Id.* No single factor is dispositive. *Escobar,* 389 F.3d at 785.

Here, the court finds that under the totality of the circumstances, Granados voluntarily consented to the search of his hotel room and the vehicle. He was 29 years old and able to understand and speak English. Although, as Granados argues, he may have smoked marijuana earlier in the day, he did not appear to be intoxicated and the evidence clearly did not "suggest that he was so intoxicated that he was not competent to understand the nature of his acts." *See United States v. Willie,* 462 F.3d 892, 896 (8th Cir.2006) (setting out standard for finding that intoxication rendered consent involuntary) (internal quotation omitted). Granados was only detained in the squad car for a few minutes, and there is no evidence that he was questioned before he signed the consent form. Granados was neither threatened or abused by officers nor promised leniency or better treatment if he consented. Although he was under arrest when he signed the consent form, the consent occurred in a public place.[2] Finally, at no point did Granados state that he wished that the hotel room or vehicle not be searched.

 Granados objects to the magistrate judge's finding that he was aware of his constitutional rights and understood his right to refuse to give consent on the grounds that Van Iten testified that he was unsure whether he went over the advisement of rights on the consent form, Granados may have been under the influence of marijuana, and Granados had not been advised of his *Miranda* rights. It is unnecessary to determine whether Granados was adequately advised of his rights because although *Miranda* warnings can lessen the probability that a defendant was subtly coerced, they are not required for consent to a search to be voluntary. *Escobar,* 389 F.3d at 786. In this case, the factors suggesting that Granados gave consent free of coercion outweigh the fact that he may not have been advised of his right to refuse consent. *See Willie,* 462 F.3d at 896–97(finding that defendant gave consent voluntarily even where he was under arrest, handcuffed, sitting in a patrol car, under the influence of methamphetamine, and had not received *Miranda* warnings because there was no evidence of police intimidation or misrepresentation or of an environment that would give rise to a presumption of involuntary choice). The court adopts the magistrate judge's recommendation that Granados consented to the search of the hotel room and Expedition freely and voluntarily.

## IV. Statements

Granados objects to the magistrate judge's recommendation that the statements he made in the Hughes County Jail later on June 14, 2008, not be suppressed. The magistrate judge found that the statements were not the fruit of an unlawful arrest because probable cause and exigent circumstances justified the arrest, and that even if the arrest were unlawful, the state-

---

**2.** Contrary to Granados' argument that a police car is not a public place, the Eighth Circuit has found that a defendant who gave consent while handcuffed in a police car in a motel parking lot was in a public place. *Willie,* 462 F.3d at 897.

ments would be admissible under *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). The court has found that the warrantless entry of Room 250 and arrest of Granados did not violate the Fourth Amendment, so the statements he made later in the day were not the fruit of the poisonous tree. The statements are admissible regardless of the *Harris* rule. Accordingly, the court adopts the magistrate judge's recommendation that Granados' statements in the Hughes County Jail not be suppressed.

## V. Photographic Lineup Identification

■ Finally, Granados objects to the magistrate judge's finding that the photographic lineup presented to the CI did not violate Granados' due process rights. Van Iten and Baldwin conducted a photo lineup on June 16, 2008. An array of six photographs was presented to the CI to see if he recognized any of the individuals as people who had delivered marijuana or money to him. The CI said that he did not receive money or marijuana, but that the person in photo number 5 could have been there when the CI gave money to Morales' brother. The CI wrote "could've been" next to photo number 5, which pictured Granados.

■ The admissibility of a pretrial identification from a photographic array is determined under a two-part inquiry. *Schawitsch v. Burt,* 491 F.3d 798, 802 (8th Cir.2007) (quoting *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). "The first step is to determine whether the array was impermissibly suggestive. If found so, the second inquiry is whether under the totality of the circumstances the array created a substantial risk of misidentification at trial." *Id.* An array is not unnecessarily suggestive where there are no differences in appearance tending to isolate the defendant's

photograph. *Id.; see also United States v. Boston,* 494 F.3d 660, 666 (8th Cir.2007) (array containing pictures of six individuals with similar physical characteristics and no other identifying information not impermissibly suggestive).

Here, Granados asserts without further explanation that his photograph was unduly and impermissibly suggestive as compared to the other five photographs in the array. The court has examined a copy of the photo array, which contains head shots of six men with similar skin tone and dark hair. Some of the men have facial hair. The array contains no identifying information. Because there are no differences in appearance that tend to isolate Granados, the array is not impermissibly suggestive. *See Schawitsch,* 491 F.3d at 803 ("Reasonable variations in hair length and facial hair are not impermissibly suggestive, especially as they can vary on any given person at different times."). Moreover, there is no indication that the officers conducting the photographic lineup made any statements or gestures to encourage the CI to select the photo of Granados. *See Boston,* 494 F.3d at 666 (array not unduly suggestive where officer did not make any suggestive sounds or gestures during the photographic lineup). Because the photographic lineup was not impermissibly suggestive, the magistrate judge did not err in finding it unnecessary to determine whether the lineup created a substantial likelihood of irreparable misidentification.

Accordingly, it is hereby

ORDERED that the court adopts the Report and Recommendation on Defendant's Motion to Suppress of Magistrate Judge Mark A. Moreno (Docket 49) as supplemented herein and, therefore, defendant's motion to suppress (Docket 39) is denied.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

MARK A. MORENO, United States Magistrate Judge.

Defendant, Ever David Granados, has filed a Motion to Suppress and Memorandum in support thereof, Docket Nos. 39, 40. In his Motion, Defendant seeks to suppress all evidence obtained following the entry and search of his motel room and his father's vehicle on June 14, 2008, and all statements made by him to law enforcement agents later that same day. He also seeks to suppress the identification made of him by a confidential informant (CI) during a photographic lineup conducted on June 16, 2008. Plaintiff, United States of America (Government), has filed a Memorandum in opposition to the suppression Motion, Docket No. 41. This Court held a lengthy evidentiary hearing on Defendant's Motion at which four witnesses testified and ten exhibits were received into evidence. Because the Motion is a dispositive one, the Court is only authorized to determine the same on a report and recommendation basis. Pursuant to 28 U.S.C. § 636(b)(1), the Court does now make and propose the following report and recommendation for disposition of the Motion.

### I.

The facts providing the backdrop for Defendant's Motion will only be briefly stated at this point. Other relevant and more detailed facts will be recited in connection with the discussion of Defendant's claims and the legal issues involved with the same.

On June 14th, law enforcement agents listened to and observed their CI make a controlled delivery of $3,970 in cash to Gonzalo Morales in Pierre, South Dakota. Morales traveled to Pierre from out of state with Defendant in a green Ford Expedition, bearing New Mexico license plates, registered to Defendant's father, David Granados of Albuquerque, New Mexico. Upon arriving in Pierre, Defendant rented a motel room, number 250, at the Kelly Inn. Having listened to surveillance communication between the CI and Morales, it was clear to agents that the trip to Pierre was for the purpose of collecting on a drug debt.

After checking into the motel with Defendant, Morales agreed to meet with the CI in the Expedition parked outside the motel. Once inside the vehicle, the CI gave Morales $3,970 and told Morales that the remaining balance owed was coming and would be paid that night. Following a brief conversation about future drug dealings, Morales and the CI exited the vehicle and were both immediately apprehended by agents.

Once Morales was arrested, agents and local officers proceeded to room 250 of the motel. An odor of marijuana was readily apparent in the hallway outside the room. Without knocking or announcing themselves, agents and officers opened the door to the room, using a room card they had obtained from motel staff. Inside, they found Defendant on a bed and promptly handcuffed and arrested him. He was then taken outside the motel and placed in a patrol car.

Five minutes or so later, FBI Agent James Van Iten contacted Defendant and requested consent to search the motel room and the Expedition. Van Iten produced a consent to search form, containing descriptions of the places for which consent to search was sought, and Defendant put his initials next to the descriptions and signed the form. Both the motel room and Expedition were subsequently searched and various items were seized from the same.

Defendant was thereafter taken to the Hughes County Jail in Pierre. There, he was advised of and waived his *Miranda* rights and was interviewed by Van Iten and DCI Agent Jason Baldwin. Defendant, however, denied any knowledge of or involvement in Morales' drug activity.

On June 16th, Van Iten and Baldwin showed the CI a photographic lineup of six individuals, which included a photograph of Defendant. The CI had told agents that Morales' brother and someone else had previously delivered marijuana to the CI. After viewing the lineup, the CI indicated that the photograph of Defendant (Number: 5) was someone who "could have been" with Morales' brother.

Defendant claims that the items seized from his motel room and the Expedition and the statements he made to agents were obtained in violation of his Fourth Amendment rights and must be suppressed under the Exclusionary Rule. He further claims that the identification procedure, utilized by agents in connection with the photographic lineup, was impermissibly suggestive and should be suppressed under the Fifth Amendment's Due Process Clause.

### III.

■ The Court must first decide whether the warrantless entry into Defendant's motel room and arrest of him violated his Fourth Amendment rights. It is a well-established constitutional principle that absent consent or exigent circumstances, law enforcement officers may not enter a person's home without a warrant. *Steagald v. United States,* 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The same protection extends to a person's privacy in temporary dwelling places such as motel rooms. *Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d

374 (1966); *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *United States v. Conner,* 127 F.3d 663, 666 (8th Cir.1997).

Before police may enter a motel room and arrest a person without a warrant, there must be probable cause for the arrest and exigent circumstances present. *United States v. Kelly,* 329 F.3d 624, 628–29 (8th Cir.2003); *United States v. McConnell,* 903 F.2d 566, 569–70 (8th Cir.1990). *cert. denied,* 498 U.S. 1106, 111 S.Ct. 1011, 112 L.Ed.2d 1093 (1991); *United States v. Davis,* 785 F.2d 610, 615 (8th Cir.1986). Probable cause exists when, at the time of the arrest, the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by another. *Dunaway v. New York,* 442 U.S. 200, 208, n. 9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Kelly,* 329 F.3d at 628. When making this determination, a reviewing court may consider the "collective knowledge and information of all of the officers involved." *United States v. Marin–Cifuentes,* 866 F.2d 988, 990 (8th Cir.1989); *United States v. Woolbright,* 831 F.2d 1390, 1393 (8th Cir.1987).

■ Exigent circumstances arise when the inevitable delay incident to obtaining a warrant must give way to the need for immediate action. *McConnell,* 903 F.2d at 569–70; *United States v. Padilla,* 869 F.2d 372, 379–80 (8th Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3223, 106 L.Ed.2d 572 (1989). Conditions under which exigent circumstances have been found include danger to police, the public or the suspect himself and the risk of removal, destruction of evidence or flight. *McConnell,* 903 F.2d at 569–70; *Padilla,* 869 F.2d at 379–80; *Davis,* 785 F.2d at 615; *United States*

*v. Jones,* 635 F.2d 1357, 1359–62 (8th Cir. 1980).

Here, agents had probable cause to believe that Defendant, at the time of his arrest, was involved in criminal activity with Morales. Such a determination is supported by the following facts and circumstances.

1. The CI, who had been involved in the distribution of marijuana in central South Dakota and who was cooperating with drug task force agents, implicated Morales (who also went by the name of "Hector") as his source for the marijuana. As part of his cooperation, the CI agreed to participate in a controlled delivery of $3,970 to Morales at a meeting that was scheduled for June 14th. The CI would be wired and agents would be monitoring the CI's communications with Morales and conducting surveillance of the meeting area.

2. In a pre-arrest debriefing, agents and assisting officers were advised that Morales and another individual, both Mexican Nationals, were traveling to the Pierre area from out of state, that they were possibly armed and that they were dealing drugs. Agents and officers were also told that Morales had previously been known to have weapons (firearms and a knife) and that he had made a prior visit to the CI's family looking for the CI and for money that he owed to Morales.

3. In response to prior "collection" text messages that he had received from Morales, the CI called Morales while Morales was en route to Pierre from Murdo, South Dakota. Agents listened in on the telephone conversation and recorded the same. During the conversation, Morales used the word "we" several times, requesting first that the CI get a room so that "we" had a place to wait for the CI, then saying that it would be better if "we" got a room before ultimately telling the CI that "we" would get the room. Morales also talked about drug dealings with the CI, mentioned Morales' brother and discussed receiving payment for marijuana Morales had earlier provided to the CI.

4. A short time later, DCI Agent Guy DiBenedetto and Pierre Police Detective Troy Swenson observed a green Ford Expedition with New Mexico license plates on it just south of Fort Pierre, South Dakota, traveling north on U.S. Highway 83 toward Pierre. DiBenedetto saw two dark haired/skinned individuals, of Hispanic origin, in the front seat of the Expedition. Swenson, in the meantime, ran a license plate check on the vehicle, which showed the registered owner to be David Granados of Albuquerque. DiBenedetto and Swenson followed the Expedition to the Kelly Inn, a motel located in the west end of Pierre.

5. Following this, Morales advised the CI by telephone (in another tape recorded conversation) that Morales had arrived in Pierre and was staying in room 250 of the Kelly Inn. When asked about payment, the CI offered to bring some money to Morales in 20 minutes.

6. Room 250 was registered to and paid for by Defendant. On the motel registration card he filled out, Defendant provided an Albuquerque address. Because the last names, residence addresses and license numbers on the motel and vehicle registrations were the same, Defendant was believed to be the

one who rented the room and who owned the Expedition.

7. Morales thereafter directed the CI to meet Morales in front of the motel at the same Expedition that had been seen less than 30 minutes earlier with two Hispanics in it.

8. Shortly after 6:00 p.m., Morales and the CI got into the Expedition. The CI gave Morales $3,970 in cash and apologized because some of the bills were in small denominations. In response, Morales indicated that "we" take anything, "even 1's." Morales also asked the CI for rubber bands to separate the bills out. Morales inquired about the rest of the marijuana debt and was told that "the other guy [would] be bringing it" later that night. In his conversation with the CI, Morales talked about being in New Mexico and "getting back to Albuquerque," and discussed other matters, including his desire to find a place in Minneapolis, Minnesota, his intention to try and bring 50 pounds of marijuana next time and then 80 pounds, him looking for more people in Minnesota and North Dakota, and his wanting to expand his marijuana distribution enterprise.

9. When the two exited the vehicle, Morales was immediately arrested and the CI was taken away to a secure location. At this time, the decision was made to enter room 250 to arrest the individual who Morales had traveled to Pierre with and who was believed to be still in the room.

10. Before entering room 250 and while Morales was with the CI, agents and officers smelled a very strong odor of burnt marijuana in front of the room.

From these facts and circumstances, a reasonably prudent task force agent would have believed that Defendant was involved, as a co-conspirator, confederate and/or aider and abettor, in illegal drug activity with Morales. Defendant transported or at least rode with Morales, in a vehicle Defendant was believed to be the owner of, for the purpose of collecting a drug debt. In addition, Defendant rented a room for Morales and allowed Morales to use Defendant's vehicle to meet with and obtain money from a drug dealer. Moreover, Defendant was present and had knowledge of one or more telephone conversations between Morales and the CI that involved discussions about ongoing marijuana activity and the collection of money for the same and did nothing to thwart, or divorce himself from, the situation. Finally, Morales' references to "we" in conversations with the CI together with the acrid odor of marijuana that emanated just outside of the motel room Defendant shared with Morales indicated, or at least suggested, that Defendant was a participant in Morales' marijuana distribution operation and that Defendant was a user of marijuana himself.

Having determined that probable cause existed to arrest Defendant does not end the inquiry. Indeed, the warrantless entry and arrest of Defendant must also be justified by exigent circumstances.

The Eighth Circuit has recognized "that the timing of undercover drug transactions make the simultaneous arrest of all conspirators a matter of special urgency." *Padilla*, 869 F.2d at 379–80; *Marin–Cifuentes*, 866 F.2d at 992; *United States v. Kulcsar*, 586 F.2d 1283, 1287 (8th Cir. 1978). In upholding the "special urgency" of such a situation, the appeals court has emphasized that one conspirator's failure to return with the proceeds of a drug transaction created significant risks and

the resulting exigency necessary for a warrantless entry and arrest. *Id.; see also United States v. Knobeloch,* 746 F.2d 1366, 1367 (8th Cir.1984) (fear of destruction of evidence was sufficient to constitute exigent circumstances justifying police officer forcing motel door open, arresting the defendant and seizing drugs from his person), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); *United States v. Palumbo,* 735 F.2d 1095, 1097 (8th Cir.) (exigent circumstances to enter a hotel room when the arrest of a single defendant outside of the room would have alerted a second defendant who was in the room with the evidence), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 268 (1984); *United States v. Wentz,* 686 F.2d 653 (8th Cir.1982) (exigent circumstances existed upon arrest of co-defendant and his failure to return to source with money).

Aside from this, the fact that the offense involved (trafficking large amounts of marijuana) was a serious one, that an associate of Morales was in the motel room possibly with access to weapons, that the identity of the CI and his family were known, that there were persons in and outside the motel who were in danger of being harmed (including Defendant himself), that a pungent burning odor or marijuana was present in the hallway just outside the motel room, and that there was a risk of removal, destruction of evidence and flight, provided an additional basis for the taking of immediate action. *Id.; McConnell,* 903 F.2d at 569–70; *Davis,* 785 F.2d at 615; *Jones,* 635 F.2d at 1359–62; *see generally* 3 W. LaFave, *Search and Seizure,* § 6.1(f) (4th ed.2004).

██ There being probable cause and exigent circumstances, the warrantless entry into Defendant's motel room and arrest of him did not violate his Fourth Amendment right against unreasonable searches and seizures.[1]

## IV.

The Court must next determine whether Defendant validly consented to the search and seizure of items from the motel room and from the Ford Expedition. This question is one that requires a broad factual inquiry and consideration of a number of factors.

Under the Fourth Amendment, warrantless searches are presumptively unreasonable, subject to a few recognized exceptions. *United States v. Sanders,* 424 F.3d 768, 773 (8th Cir.2005). Consent is one such exception if the consent is voluntary.

Consent is voluntary when, based on the totality of the circumstances present, it is given without coercion, express or implied. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Laing v. United States,* 891 F.2d 683, 686 (8th Cir.1989). The Government bears the burden of showing, by a preponderance of the evidence, that a reasonable person would have believed that the consent alleged to have been given was the product of an "essentially free and unrestrained choice," and not "the result of duress or coercion," based on the "totality of all the circumstances." *United States v. Willie,* 462 F.3d 892, 896 (8th Cir.2006) (quoting *Schneckloth,* 412 U.S. at 225, 227, 248, 93 S.Ct. 2041), *cert. denied,* 549 U.S. 1292, 127 S.Ct. 1847, 167 L.Ed.2d 341 (2007).

Eighth Circuit case law provides a catalog of factors for a court to consider in determining the voluntariness of a defen-

---

1. Nor did the agents' unannounced entry with a motel card key violate the statutory obligation imposed on them to give "notice of [their] authority and purpose" under 18 U.S.C. § 3109. The exigent circumstances exception to the warrant requirement applies equally to statutes like § 3109 because this exception existed at common law, of which the statute is a codification. *Padilla,* 869 F.2d at 380, n. 4.

dant's consent to search. Some of the factors relate to the characteristics and behavior of the defendant, such as his age, intelligence, education, and knowledge of his constitutional rights (whether from prior or contemporaneous *Miranda* warnings or from previous contacts with police), whether he was under the influence of alcohol or drugs, and whether he objected to the search or stood silently by when it occurred. *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir.1990). Others relate to the environment at the time the defendant allegedly gave consent, such as whether he was in custody or under arrest and whether he was in a public or secluded place. *Id.* Still others relate to the interaction between police and the defendant during the encounter, such as whether he was detained and questioned for a long time before consent was given, whether police threatened, physically intimidated or punished him, and whether he relied on promises or misrepresentations made by police in giving his consent. *Id.* No one factor is dispositive; instead, they are tools for the court to use in analyzing the totality of the circumstances. *See Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041.

While some of these factors weigh against voluntariness, the Court is nonetheless satisfied that Defendant's will was not overborne and his capacity for self-determination was not critically impaired so that his consent to the search of his motel room and the Expedition was involuntary. *See United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Defendant was 29 years old at the time of his arrest. Although he dropped out of school in Mexico in the ninth grade, he was able to read, write and understand the English language. In fact, he conversed in English and pointed out an error that had been made in the spelling of his first name on the consent form. He was cooperative, responded to inquiries made

of him, and had no questions before or after signing the form.

While it is true that Defendant had not been given any *Miranda* warnings before he consented to the search, this fact—like the other factors earlier discussed—is not determinative of the question of voluntariness. *See Schneckloth*, 412 U.S. at 246, 249, 93 S.Ct. 2041; *see also United States v. Lee*, 356 F.3d 831, 834 (8th Cir.2003) ("*Miranda* warnings ... are not required for consent to a search to be voluntary, although they can lessen the probability that a defendant was subtly coerced."), *cert. denied*, 541 U.S. 1092, 124 S.Ct. 2830, 159 L.Ed.2d 257 (2004). Even without the warnings, there is evidence that Defendant was aware of his constitutional rights. He signed a consent form that stated (1) he was voluntarily giving permission to search his motel room and the Ford Expedition and (2) he had been advised of his right to refuse consent. Before signing the form, he corrected the misspelling of his first name and initialed the two places sought to be searched. A forceful inference from these facts can be drawn that Defendant understood both the consequences of giving consent and his right to refuse it.

No threats, intimidation or punishment were used on Defendant and no promises or misrepresentations were made to procure consent from him. In short, the environment was not one that would give rise to a presumption of involuntary choice. Granted, Defendant was under arrest and handcuffed at the time he gave his consent. But, he had not been subjected to extended questioning and had only been under arrest for a very short time. In addition, he was in a public place (a motel parking lot) when he gave his consent. *See Watson*, 423 U.S. at 424, 96 S.Ct. 820 (finding valid consent despite a defendant's arrest when the consent was given in a public setting and there was no evidence of

coercive police tactics). The totality of the circumstances do not suggest that Defendant's consent, given both orally and in writing, was anything other than a free choice, and the Court so finds and concludes.

### V.

The Court must also decide whether the statements Defendant made to Van Iten and Baldwin on June 14th, following the search of Defendant's motel room and the Ford Expedition, should be suppressed under the Fourth Amendment's Exclusionary Rule.[2] Because probable cause and exigent circumstances existed for the entry and arrest of him in the motel room and because the searches of his room and the Expedition were consensual, Defendant's subsequent statements were not "tainted" by or the "poisonous fruit" of the entry, arrest and searches so as to violate the Fourth Amendment and require suppression of the statements at trial.

Even assuming, *arguendo*, that Defendant's warrantless arrest was illegal and not in compliance with the dictates of *Payton* (because exigent circumstances did not exist), the Government is nonetheless still not barred by the Exclusionary Rule from using his statements as substantive evidence at trial. *New York v. Harris*, 495 U.S. 14, 21, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990); *United States v. Duchi*, 944 F.2d 391, 395 (8th Cir.1991). The Supreme Court in *Harris* held that *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) was distinguishable because the incriminating statements in that case were taken after an arrest without probable cause. 495 U.S. at 18–19, 110 S.Ct. 1640. As a result, the defendant's statements were "not the product of being in unlawful custody." *Id.* at 19, 110 S.Ct. 1640. In contrast, the defendant in *Harris*

was not illegally held when he was removed to the station house, given *Miranda* warnings and allowed to talk. *Id.* at 18, 110 S.Ct. 1640. According to the *Harris* Court, inasmuch as the police had a basis for questioning the defendant prior to his arrest, his subsequent statement was not an exploitation of the illegal entry into his home that required exclusion. *Id.* at 19, 110 S.Ct. 1640.

*Harris* thus makes clear that for statements to be considered the fruit of an illegal search, they must be directly or indirectly attributable to the constitutional violation. In *Harris*, even though the illegal arrest was a "but for" cause of the later statement (in that without the illegal arrest no statement would have been made), the arrest was not the proximate cause of the statement because the statement was not obtained during the unconstitutional entry into the defendant's home.

The same is true in this case. Agents had probable cause to arrest Defendant for a drug offense and did not "exploit" any alleged illegality, with respect to the entry into the motel room, to obtain Defendant's statements as was the case in *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Instead, after being Mirandized and waiving his rights, Defendant chose to talk to agents and answer questions posed to him.

 Regardless, Defendant's statements are, at a minimum, admissible at trial for impeachment purposes when and if he testifies. *Oregon v. Hass*, 420 U.S. 714, 720–24, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York*, 401 U.S. 222, 223–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *see also United States v. Havens*, 446 U.S. 620, 624–28, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) (holding that the rationale of *Hass*

---

**2.** It should be noted that Defendant seeks to suppress his post-arrest statements based on

alleged violations of the Fourth, but not the Fifth, Amendment.

and *Harris* permit the use of illegally obtained evidence to impeach statements made by the defendant on cross-examination). Defendant's statements were made voluntarily and were not the product of coercion, express or implied.[3] *See and compare Mincey v. Arizona,* 437 U.S. 385, 397–402, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

## VI.

The final question the Court must pass on is whether the photographic lineup, from which the CI identified Defendant, violated Defendant's due process rights under the Fifth Amendment. The Court finds and concludes that it did not.

A pre-trial photographic identification or "array" may implicate a defendant's due process rights and its admissibility is reviewed using a two-step inquiry. *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *United States v. Donelson,* 450 F.3d 768, 772 (8th Cir.), *cert. denied,* 549 U.S. 982, 127 S.Ct. 451, 166 L.Ed.2d 320 (2006). The first step is to determine whether the lineup or array was "impermissibly suggestive." *United*

*States v. Boston,* 494 F.3d 660, 666 (8th Cir.2007) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)); *United States v. Martin,* 391 F.3d 949, 952 (8th Cir.2005). If such a finding is made, the second step is to determine whether, under the totality of the circumstances, the lineup or array created a "very substantial likelihood of irreparable misidentification." *Id.; Donelson,* 450 F.3d at 773.

The photographic lineup or array presented to the CI here contained pictures of six individuals with similar characteristics and no other identifying information. *See Manson,* 432 U.S. at 117, 97 S.Ct. 2243 (other individuals in photo spreads should ideally resemble the suspect). Baldwin asked the CI if anyone had ever delivered marijuana or money to any of the individuals depicted in the photographs. The CI said no, that he had never received money or marijuana, but added that one of the individuals "could have been there when [he] gave it to [Morales'] brother." The CI then identified the individual found in Photo Number: 5 as the person who "could've" been present, but made no com-

---

**3.** A statement is involuntary when it is extracted by threats, violence or express or implied promises sufficient to overbear a suspect's will and critically impair his capacity for self-determination. *United States v. LeBrun,* 363 F.3d 715, 724 (8th Cir.2004) (*en banc*), *cert. denied,* 543 U.S. 1145, 125 S.Ct. 1292, 161 L.Ed.2d 105 (2005); *United States v. Brave Heart,* 397 F.3d 1035, 1040 (8th Cir.2005). Whether the suspect's will has been overborne is determined by examining the totality of the circumstances, including both the conduct of the officers in exerting pressure on the suspect and the suspect's ability to resist that pressure. *Id.*

After reviewing the record and assessing the credibility of the witnesses who testified, the Court is unable to find that the requisite coercive or overreaching conduct was present on June 14th so as to make Defendant's statements to Van Iten and Baldwin involuntary. No threats or promises were made to Defen-

dant and no undue influence or pressure was exerted on him. He answered questions asked of him without hesitation, including ones inquiring about his alien status, what his phone numbers were, whether he was married and where he had been earlier that day. He also proclaimed that he was not involved in any drug activity and had merely given Morales a ride. He said that he was willing to take a polygraph examination and would pass the same. At no time did he ever invoke any of his rights or admit that he had any knowledge of why he and Morales came to Pierre. There can be little doubt that Defendant's statements were voluntary and not the product of coercive action that undermined his ability to exercise his free will and make decisions for himself. *See United States v. Plumman,* 409 F.3d 919, 924–25 (8th Cir.2005); *United States v. Bordeaux,* 400 F.3d 548, 560–61 (8th Cir.2005).

**1132**

ments about any of the other individuals in the lineup.

Challenges to six-person photographic lineups, like the one used in this case, as being impermissibly suggestive, have consistently been rejected by the Eighth Circuit. *See e.g. Boston,* 494 F.3d at 666; *Schawitsch v. Burt,* 491 F.3d 798, 800, 803 (8th Cir.2007); *Donelson,* 450 F.3d at 773. The Court has reviewed the lineup shown to the CI and finds that there are no differences in appearance which tend to isolate Defendant's photograph. *Schawitsch,* 491 F.3d at 802; *United States v. Mays,* 822 F.2d 793, 798 (8th Cir.1987). Moreover, there is no evidence that Van Iten or Baldwin said or did anything to influence the CI during the lineup and there is no requirement that such a lineup be administered by officers who are independent from the investigation. *Boston,* 494 F.3d at 666. Accordingly, the lineup used by agents was not unduly suggestive, and as such, there is no need to proceed to the second step of the inquiry and determine whether the CI's equivocal identification is reliable. *Boston,* 494 F.3d at 666; *United States v. Daily,* 488 F.3d 796, 804 (8th Cir.2007).

### VII.

For the reasons stated herein, the Court hereby recommends that Defendant's Motion to Suppress, filed at Docket No. 39, be denied in all respects.

Sept. 19, 2008.