# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1175

_____

United States of America

*Plaintiff - Appellee*

v.

Lance Majestic House

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: October 23, 2015
Filed: May 23, 2016

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Lance House appeals his conviction for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He argues that the district court[1] erred in denying his motion to suppress photographic identification evidence, and for the first

_____

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

time on appeal, he contends that a show-up identification tainted subsequent photographic and in-court identifications.  We affirm.

I.

On July 26, 2013, Logan Engelbrecht and Taylor Hruska were driving near Lowell Elementary School in Sioux Falls, South Dakota, when they saw a man pointing a handgun at another man.  Engelbrecht, who was driving, called 911 and described the gunman as wearing a red shirt, black pants, and a black hat, and having a "fro" with a ponytail.  She indicated that he was holding a small, black handgun. After Engelbrecht stopped the car, Hruska got out of the vehicle and walked toward the area where they had spotted the man with the gun.  Hruska observed the gunman walking away from the scene.

At about the same time, construction workers Shawn Jaminet and Jason Diamond were replacing a door at Lowell Elementary School and saw a man with a gun approach a group of people across the street from the school.  The man pointed the gun in another man's face.  Jaminet called 911 to report the incident and watched the gunman run away from the group.  He described the gunman as having a ponytail and wearing a red shirt and black hat.

Two Sioux Falls Police Department ("SFPD") officers, Officer Chris Bauman and Reserve Officer Steve Schumacher, responded to the 911 calls.  When the officers arrived on the scene, they discovered House walking down the street with another individual.  Both officers observed that House was wearing a red shirt, black pants, and a hat.  The officers pulled their patrol car over to the curb, exited the vehicle, and drew their firearms.  They told House and the other man to freeze and put their hands up, but House ran away from the scene.  Officers Bauman and Schumacher ran after House.  Hruska continued to observe House as the officers pursued him.  Then, after the officers caught House, Hruska approached the police.

-2-

By the time Hruska got to the police, the officers had already placed House in the back of their patrol car. Hruska identified House as the man she saw with the gun. Engelbrecht was not asked to identify House.

Emmet Warkenthien, a special agent with the Bureau of Alcohol, Tobacco, and Firearms and Explosives, became involved with the investigation of House after House's arrest. Agent Warkenthien developed a photographic lineup to show Hruska. He met with an SFPD intelligence analyst to use a computer program that compared House's Minnehaha County jail booking photograph to photographs of other individuals booked into the same jail. They entered House's physical characteristics into the program to find individuals with similar features, and created a photographic lineup with color booking photographs of six individuals.

On August 20, 2013, Agent Warkenthien met with Hruska and showed her the photographic lineup. He told her that the person she observed on July 26, 2013 may or may not be in the photographic lineup, and if the person she observed was pictured in the lineup, she should identify the person by placing her initials next to the photograph. Agent Warkenthien did not suggest to Hruska which person may have been the person she observed. Hruska immediately identified photograph number two, which was the photograph of House. Hruska had never seen House prior to July 26, 2013 and did not know his name at the time of the photographic lineup.

On January 7, 2014, a grand jury indicted House, charging him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922 (g)(1). House pled not guilty. Before trial, House moved to suppress Hruska's identification of him in the photographic lineup on the basis that it was impermissibly suggestive. United States Magistrate Judge John E. Simko held a suppression hearing on March 5, 2014 in which Agent Warkenthien served as the government's sole witness. Agent Warkenthien testified that when he showed Hruska the six-person photographic lineup, Hruska immediately identified House as the individual who had the gun on

July 26, 2013. Judge Simko filed a report and recommendation suggesting that the district court deny House's motion to suppress. The district court adopted Judge Simko's report and recommendation and denied the motion to suppress.

The case was tried before a jury on July 1 and 2, 2014. At trial, Hruska, Engelbrecht, and Diamond made in-court identifications of House as the person whom they observed holding a firearm on July 26, 2013. Officers Bauman and Schumacher also made in-court identifications of House as the individual who ran from them.

The jury returned a guilty verdict against House. On January 9, 2015, House was sentenced to 78 months imprisonment followed by three years of supervised release. House filed a timely notice of appeal.

II.

House first argues that the district court erred in denying his motion to suppress Hruska's identification of House in a photographic lineup. "When reviewing the denial of a motion to suppress, we review the district court's legal conclusions de novo but its factual findings for clear error." United States v. Burston, 806 F.3d 1123, 1126 (8th Cir. 2015). "We will affirm the district court unless the denial of the motion is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake was made." United States v. Zamora-Lopez, 685 F.3d 787, 789 (8th Cir. 2012) (internal quotations omitted).

The Supreme Court has established a two-step inquiry into photographic lineups. Schawitsch v. Burt, 491 F.3d 798, 802 (8th Cir. 2007) (citing Manson v. Brathwaite, 432 U.S. 98, 116 (1977)); see also Neil v. Biggers, 409 U.S. 188, 197 (1972); Simmons v. United States, 390 U.S. 377, 384 (1968). First, we must

determine whether the lineup was impermissibly suggestive. Schawitsch, 491 F.3d at 802. If we find that the lineup is impermissibly suggestive, then we must examine whether under the totality of the circumstances the lineup created a substantial likelihood of misidentification at trial. Id.

House argues that because he was the only individual in the photographic lineup with long hair and a pony tail, the lineup was impermissibly suggestive. Furthermore, House asserts that in its denial of the motion to suppress, the district court made factual findings, primarily based on Agent Warkenthein's testimony at the suppression hearing, that did not comport with the evidence produced at trial.

The photographic lineup displayed six photographs of men wearing black-and-white striped jail clothing. The photographs are all proportional in size, and the background color and lighting is consistent. All of the men have dark brown hair, and brown eyes. Their complexions are similar but not identical. Three of the six have neck tattoos. The men appear to be roughly the same age. All but one have facial hair of some sort, and three have goatees. Their hair varies in length: two have short hair, three have "afro-style" hair, and one man, House, appears to have a ponytail.

In denying House's motion to suppress, the district court reasoned that the ponytail was not impermissibly suggestive because Hruska never mentioned a ponytail in her description of the suspect to the 911 operator. Yet, Hruska's testimony at trial and Engelbrecht's recorded 911 call suggest that the ponytail was a distinctive feature of House's that aided Hruska in identifying him. At trial, Hruska testified that the man she saw with the gun had an afro and was wearing it in a ponytail. From the record, it appears that the recording of Engelbrecht's 911 call was not played at the suppression hearing, but it was played at trial. Engelbrecht describes House as having "kind of like a 'fro,' with a ponytail." Hruska, as a passenger in Engelbrecht's vehicle, can be heard speaking in the background of the

-5-

911 call. Thus, one could reasonably conclude that Hruska was listening to and agreed with Engelbrecht's description of House, and that she too recognized the ponytail as a distinguishing feature. Nevertheless, House never renewed his motion to suppress based on the recording of Engelbrecht's 911 call or Hruska's testimony at trial, even though they were inconsistent with Agent Warkenthien's testimony at the suppression hearing.

Although the district court's rationale for denying House's motion to suppress–that Hruska did not identify the ponytail as one of House's distinguishing characteristics–was undermined by evidence produced at trial, the photographic lineup was not impermissibly suggestive. All of the men have brown eyes, darker complexions, and dark brown hair. The ponytail is not prominently displayed in House's picture, and even appears as though it could be a shadow. Three of the other men have "afro-style" hair that is not in a ponytail. In a photographic lineup, reasonable variations in hair length or style are not impermissibly suggestive, "especially as they can vary on any given person at different times." Schawitsch, 491 F.3d at 803. Thus, the mere fact that House is the only individual pictured with a ponytail does not render the photographic lineup unduly suggestive. Therefore, the district court's factual findings were not clearly erroneous, and the court did not err in denying House's motion to suppress Hruska's identification of House in the photographic lineup.

III.

House also contends that Hruska's identification of House at a show-up was impermissibly suggestive and tainted the photographic lineup and in-court identifications of House by Hruska and Engelbrecht. House did not argue this contention before the district court.

-6-

When a defendant fails to object to the admission of evidence at trial, we review for plain error. United States v. Pirani, 406 F.3d 543, 550 (8th Cir. 2005) (en banc). The defendant must prove that there was (1) error; (2) that was plain; and (3) that affects the substantial rights of the defendant. Id. (citing United States v. Olano, 507 U.S. 725, 732 (1993)). In most cases, for an error to affect the defendant's substantial rights, the error must have been prejudicial, meaning it affected the outcome of the district court proceedings. Puckett v. United States, 556 U.S. 129, 135 (2009) (citing Olano, 507 U.S. at 734). Further, we will exercise our discretion to correct an unpreserved procedural error only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 732 (quoting United States v. Young, 470 U.S. 1, 15 (1985)).

To determine whether error occurred, we must decide whether the show-up was impermissibly suggestive and unreliable. This requires the same two-step inquiry that we utilized previously in examining the admission of the photographic lineup. The Supreme Court has held that with respect to the admission of an out-of-court identification such as a show-up, "[i]t is the likelihood of misidentification which violates a defendant's right to due process." Biggers, 409 U.S. at 198. Thus, "[a] crime victim's identification of the defendant is admissible unless it is based upon a pretrial confrontation between the witness and the suspect that is both impermissibly suggestive *and* unreliable." United States v. Martinez, 462 F.3d 903, 910 (8th Cir. 2006)(citation omitted). An identification is unreliable if the circumstances allow for "a very substantial likelihood of irreparable misidentification." Id. (internal quotation marks and citation omitted). "The relevant circumstances include ' the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation.'" United States v. Jones, 535 F.3d 886, 891 (8th Cir. 2008) (quoting United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003)).

Here, Hruska, as a passenger in Engelbrecht's vehicle, observed a man pointing a gun at another person. The gunman was standing on the sidewalk adjacent to the street upon which Engelbrecht drove, and therefore was in close proximity to Hruska. While Hruska was still in the vehicle, Engelbrecht called 911 and described the gunman as a "large man, with a red shirt . . . black shorts, with a black hat on, and he has kind of like a 'fro,' with a ponytail." After Engelbrecht parked, Hruska exited the vehicle and walked toward the area where she had seen the man with the gun. As she approached, she observed the gunman cross the street and walk away from the scene. Then, she watched the police stop and subsequently chase the gunman. After the police had him in custody, Hruska and Engelbrecht walked toward the police. Upon their arrival, House was already in handcuffs and in the back of the patrol car. The police asked Hruska if House was the man she had seen with the gun, and she confirmed that House was the man she had observed.

House argues that the show-up was unduly suggestive because an officer told Hruska "this is the person" while House was handcuffed in the back of the patrol car. "Necessary incidents of on-the-scene identifications, such as the suspects being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive." United States v. King, 148 F.3d 968, 970 (8th Cir. 1998). Moreover, Hruska testified at trial that the police officers checked with her to confirm that they had arrested the man she saw with the gun. They did not ask Engelbrecht to confirm the arrestee's identity, but Engelbrecht was also present for the show-up and did not express any doubt. Under these conditions, the show-up was not unduly suggestive.

Our conclusion is reinforced by the fact that the circumstances reveal little chance that the show-up resulted in an unreliable identification of House. Hruska had ample opportunity to view House at the time of the crime because she was a passenger in a vehicle that passed House as he stood on the sidewalk adjacent to the street while pointing the gun at another person. Further, Hruska largely devoted her

attention to observing House until he was in police custody. Engelbrecht's description of the suspect matched House's appearance at the time of his arrest.[2] Mere minutes passed between Engelbrecht's 911 call and Hruska's show-up identification. At trial, Hruska testified that she saw the same man point the gun, walk away from the scene, and run from the police, and that shortly after she witnessed these events, she saw him in the back of the police car at the show-up. Based on this evidence, it is exceedingly unlikely that Hruska misidentified House as the gunman at the show-up.

Because there is no substantial likelihood of irreparable misidentification, we do not consider the further argument that Hruska's and Engelbrecht's subsequent photographic identifications and in-court identifications of House were tainted by the show-up. See United States v. Hadley, 671 F.2d 1112, 1116 (8th Cir. 1982) ("Since we conclude that the show-up identifications pass constitutional muster, we do not consider the further argument that the witnesses' in-court identifications were the 'poisonous fruit' of tainted out-of-court procedures.")

Therefore, we hold that the district court did not plainly err by failing to suppress Hruska's show-up identification, as well as Hruska and Engelbrecht's photographic and in-court identifications, of House.

IV.

Accordingly, we affirm the judgment of the district court.

_____

---

[2]Furthermore, Jaminet, the other 911 caller, provided a description of the gunman identical to Engelbrecht's: "black hat, ponytail, red shirt."

-9-