# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-1122

_____

United States of America,

*Plaintiff - Appellee,*

v.

September Waloke,

*Defendant - Appellant.*

_____

Appeal from United States District Court
for the District of South Dakota - Pierre

_____

Submitted: November 16, 2018
Filed: May 16, 2019

_____

Before COLLOTON, SHEPHERD, and STRAS, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury convicted September Waloke of harboring or concealing a person from arrest, in violation of 18 U.S.C. § 1071. The district court[1] denied Waloke's post-trial

_____

[1]The Honorable Roberto A. Lange, United States District Judge for the District of South Dakota.

motion for judgment of acquittal or new trial, and sentenced her to three months' imprisonment. Waloke appeals the denial of her motion, and we affirm.

I.

The case arises from efforts by law enforcement to apprehend one Tyson LeCompte, who absconded from custody while on a furlough from jail to attend a funeral in October 2016. While LeCompte was awaiting sentencing on a federal drug conviction, a magistrate judge released him to attend the funeral of his aunt. LeCompte left the county jail on the morning of October 19 with orders to return by 6:00 that evening. He went to the residence of Erica Condon to pick up clothes that his ex-girlfriend, Carlee Condon, brought from another location. Erica and Carlee are daughters of Waloke and Everett Condon. According to LeCompte, Waloke was also at Erica's residence on the morning of October 19, and he had a conversation with her then.

LeCompte attended the funeral and burial, but then decided not to return to jail and instead left with a cousin. LeCompte and the cousin spent the afternoon smoking methamphetamine and drinking alcohol. LeCompte eventually called Carlee Condon to pick him up, and they attended a party until about 3:00 a.m.

When LeCompte failed to return to jail by the appointed time, the magistrate judge issued an arrest warrant. The Marshals Service received information that LeCompte might be staying with Waloke and Everett Condon, so investigators searched the Waloke-Condon home, but did not find LeCompte. They informed Waloke and Condon that there was a warrant for LeCompte's arrest, and that the couple should not assist him in avoiding apprehension. Waloke assured the deputy marshals that LeCompte would not stay with them, because her daughter Carlee was no longer in a relationship with LeCompte, and that Carlee and LeCompte were not

-2-

on good terms. Waloke did not disclose that she, LeCompte, and Carlee were together at Erica's residence that morning.

After the deputy marshals departed the Waloke-Condon house on the evening of October 19, LeCompte and Carlee Condon arrived at the house between 5:00 and 7:00 a.m. the next morning. According to LeCompte, he entered the home through a window in Carlee's room to avoid detection by the family. He claimed then to have spent most of October 20 sleeping in the bedroom, leaving only briefly to watch television and smoke a cigarette outside. He acknowledged that after he returned from smoking, he left his shoes inside the house near the front door. He testified that he did not speak with anyone other than Carlee Condon while in the house.

Braxtyn Garreau, LeCompte's cousin, testified that on October 20, she attempted to contact LeCompte by calling a telephone number from which he had called her during the funeral. Waloke answered the call. Garreau asked Waloke if LeCompte was still at her house; Waloke responded that LeCompte and Carlee were sleeping at Waloke's house. Garreau asked Waloke to tell LeCompte that he should be prepared to leave, because she planned to pick him up later that night to flee to Rapid City.

On the night of October 20, Cheyenne River Sioux Tribe law enforcement authorities received a tip that LeCompte was staying at the Waloke-Condon home. Sergeant Jeremy Reede went to the house with two other officers and a warrant for LeCompte's arrest.

Reede knocked on the front door and waited for just under a minute. Waloke opened the door, and Reede asked her whether she had seen LeCompte or Carlee. Waloke said that she had not. Reede then asked for consent to search the house; Waloke responded that LeCompte was not there. Reede again requested consent to enter the house, but Waloke ignored the request, said that she needed to get back to

the stove, and began walking toward the kitchen. Reede followed her into the house and asked again whether he could look for LeCompte. Waloke turned to Everett Condon and said, "He's not here. Is he, Everett?" Everett responded that he had not seen LeCompte. Reede asked once more to search the house, and Waloke then gave consent.

After Reede looked in a few rooms, he noticed Carlee Condon leaving another room and shutting the door behind her. Reede entered that room and saw a neatly-made bed with a lump in the mattress. Reede lifted the mattress and discovered LeCompte hiding between the mattress and box spring. He instructed LeCompte to come out from under the mattress and then escorted him to the dining room near the entrance of the house.

Waloke, Everett Condon, Carlee Condon, and a neighbor were in the dining room when Reede and LeCompte approached. According to Reede and the neighbor, Waloke appeared sad, not surprised, to see LeCompte. She had tears in her eyes and gave LeCompte a hug after he entered the room. LeCompte put on his shoes, which were still near the front door, and the officers formally took him into custody. Shortly after the officers departed with LeCompte, Garreau arrived at Waloke's house to follow through on her plan to take LeCompte to Rapid City.

A grand jury charged Waloke and Everett Condon with one count of harboring and concealing a person from arrest. The jury convicted Waloke but acquitted Condon. Waloke moved for a judgment of acquittal based on insufficient evidence, and a new trial based on the weight of the evidence, but the court denied the motions and sentenced Waloke to three months' imprisonment.

We review *de novo* the court's denial of a motion for judgment of acquittal, viewing the evidence and all reasonable inferences in the light most favorable to the jury's verdict. *United States v. Hill*, 750 F.3d 982, 987 (8th Cir. 2014). We will

-4-

direct a judgment of acquittal only when no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.* We review the district court's ruling on Waloke's new trial motion for abuse of discretion. *United States v. Clayton*, 787 F.3d 929, 935 (8th Cir. 2015).

II.

The offense of concealing a person from arrest, in violation of 18 U.S.C. § 1071, has three elements: (1) the defendant had specific knowledge that a federal warrant was issued for the fugitive's arrest, (2) the defendant actually harbored or concealed the fugitive, and (3) the defendant intended to prevent the fugitive's discovery and arrest. *United States v. Hayes*, 518 F.3d 989, 993 (8th Cir. 2008). Waloke does not dispute that the government proved her knowledge of the warrant for LeCompte's arrest in light of what the deputy marshals told her on the evening of October 19. But she argues that there was insufficient evidence to prove beyond a reasonable doubt that she actively harbored or concealed LeCompte, or that she intended to prevent his discovery and arrest.

A person harbors or conceals a fugitive by engaging in "any physical act of providing assistance, including food, shelter, and other assistance to aid . . . in avoiding detection and apprehension." *United States v. Erdman*, 953 F.2d 387, 390 (8th Cir. 1992) (quoting *United States v. Silva*, 745 F.2d 840, 849 (4th Cir. 1984)). To prove this element, the government presented evidence that LeCompte spent at least twelve hours in Waloke's home on October 20. LeCompte's shoes were found near the front door, supporting an inference that he entered the house in a way that Waloke could have seen him, or that Waloke could have inferred his presence from the shoes. Garreau testified that Waloke acknowledged in a telephone call on October 20 that LeCompte was sleeping in Waloke's house. And two witnesses testified that Waloke did not express surprise that Sergeant Reede found LeCompte in a bedroom, but rather appeared sad and hugged LeCompte before he left. This

-5-

evidence was sufficient to support the jury's finding that Waloke assisted LeCompte by providing shelter while he was hiding from law enforcement.

There was also sufficient evidence to support the jury's finding that Waloke intended to prevent LeCompte's discovery and arrest. There was evidence that Waloke misled or lied to authorities. She told deputy marshals on October 19 that LeCompte would not likely be with her daughter Carlee, even though Waloke had seen him with Carlee earlier that day at Erica's apartment. On October 20, Waloke told Sergeant Reede several times that LeCompte was not in her house; the jury could have found that she was lying based on Garreau's testimony and other circumstantial evidence. Evidence of Waloke's delaying tactics on October 20 also supported a finding of intent. A jury reasonably could have inferred that Waloke hesitated in answering the door and delayed providing consent to search so that LeCompte quickly could hide himself between the box spring and mattress of a neatly-made bed.

Waloke argues that her case is factually similar to *United States v. Foy*, 416 F.2d 940 (7th Cir. 1969). There, the defendant was visiting an apartment of a third person where a fugitive also was located. When FBI agents arrived to look for the fugitive, the defendant lied and said that he had not seen the fugitive since the day before. Agents eventually found the fugitive on a ledge outside the bedroom window of the apartment. The court held that there was insufficient evidence to convict the defendant, because the statute "does not impose a duty on one who may be aware of the whereabouts of the fugitive, although having played no part in his flight, to reveal this information on pain of criminal prosecution." *Id.* at 941. A dissenting judge would have affirmed the conviction and distinguished between a "mere mute refusal to assist the officers and deliberate misstatements of fact designed to mislead the police so as to prevent the fugitive's discovery and arrest." *Id.* at 942 (Knoch, J., dissenting). This court has not adopted the reasoning of *Foy*, and in any event, Waloke did more than lie about her knowledge: the evidence supported a finding that

-6-

she allowed LeCompte to conceal himself in her home and sought to delay his discovery.

Waloke's case is more akin to *United States v. Hash*, 688 F.2d 49 (8th Cir. 1982) (per curiam), where this court affirmed the conviction of a defendant who allowed a fugitive to stay in her trailer home, falsely told marshals at the home that the fugitive was not present, and refused to consent to a search of the home. *Id.* at 50. The defendant complained that there was insufficient evidence of concealment because the fugitive eventually revealed himself within five to ten minutes, but we held that "[t]he statute does not prescribe a minimum duration of concealment for its violation." *Id.* at 52. The defendant's denial that the fugitive was in her home and her refusal to admit the officers "were active measures of concealment" taken to prevent discovery and arrest of the fugitive. *Id.* Similarly in this case, Waloke's delay in allowing the officers to enter and search the house, regardless of its duration, together with her false statements to investigators, support a finding that she intentionally harbored and concealed LeCompte.

Waloke argues alternatively that the district court abused its discretion by denying her motion for a new trial. In evaluating a motion for a new trial, the district court may weigh the evidence and judge the credibility of the witnesses to determine whether there was a miscarriage of justice that warrants a new trial. *United States v. Samuels*, 543 F.3d 1013, 1019 (8th Cir. 2008). Waloke contends that Garreau was not credible because she was "a heavy methamphetamine user, was clearly testifying in hopes of a reduced jail sentence, and provided multiple inconsistent statements." The district court acknowledged that there were reasons to question Garreau's credibility, but concluded that the jury must have believed her, and that this trial was not the type of exceptional case in which the court should invoke its power to grant a new trial. The district court observed Garreau's testimony and was in the best position to determine whether a verdict relying in part on her evidence was a miscarriage of justice. *See United States v. Hilliard*, 392 F.3d 981, 988 (8th Cir.

2004). We conclude that there was no abuse of discretion in denying the motion for new trial.

Waloke also complains that it was a miscarriage of justice to convict her when the jury acquitted co-defendant Everett Condon. As the district court observed, however, the actions of the two defendants were sufficiently different to justify divergent verdicts. While there was evidence that Waloke misled investigators about the relationship between LeCompte and Carlee, acknowledged to Garreau that LeCompte was in her home, and then delayed Sergeant Reede's efforts to find LeCompte, the government did not produce comparable proof against Everett. There was a reasonable explanation in the evidence for why the jury distinguished between the two defendants, and the district court permissibly concluded that the disparate verdicts did not produce a miscarriage of justice that warranted a new trial for Waloke.

\*      \*      \*

The judgment of the district court is affirmed.

_____