# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3411

_____

United States of America

*Plaintiff - Appellee*

v.

David Tachay Heard, also known as Tashay, also known as Kill Bro Heard, also known as Kill Bro

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: November 15, 2019
Filed: March 3, 2020

_____

Before COLLOTON, WOLLMAN, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

A jury convicted David Tachay Heard on four counts: (1) possessing a firearm in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2); (2) possessing with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), § 841(b)(1)(D), and § 851; (3) possessing a firearm in furtherance of a drug trafficking

crime in violation of 18 U.S.C. § 924(c)(1)(A) and § 924(c)(1)(C)(i); and (4) possessing a stolen firearm in violation of 18 U.S.C. § 922(j) and § 924(a)(2). He appeals the conviction. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

On the evening of July 30, 2017, Justin Summers was a passenger in the front seat of an SUV driven by his wife on Redbud Road. Around 7:20 pm, he called 911 reporting he had just seen a parked car with "substantial front-end damage." Next to the driver's side of the car was a man Summers described as a "black male," "anywhere from maybe 5'9'' to 6-foot," with a white hat and dark clothes. Summers saw the man throw something "small" into "the weeds" on the side of Redbud Road.

Concerned, Summers and his wife "came really slow up on the car . . . looking to see if he needed some help or if there was anybody else in the car that needed help." The man "tipped his head back so [Summers] could see his face really good" and "very clearly." He was "looking for something in his passenger side" and "was very agitated, more so than what you would be if you were in an accident." Summers and his wife "slowed down almost to a stop next to his car and he basically through a facial expression made it very clear that he didn't want us there." As Summers and his wife drove away, Summers saw the man throw "a semiautomatic pistol into the . . . weeds or the ditch there." Summers said no one else was in the car or "around at all."

Arriving at the scene, police found Heard, who is five-foot-eight-inches tall, wearing a black t-shirt and blue jeans. They searched the wooded area near the car and found a bag of marijuana with 27 individually packaged baggies and a fully loaded "extremely clean" firearm with "no dirt or debris on it." They arrested Heard.

Around 8:45 pm, officers asked Summers to return to the scene. He arrived at dusk. Officers positioned Heard (handcuffed with a spotlight shining on him) 20 to

25 feet from Summers. Officers told Summers "to have an open mind, and to tell them if it was or was not the person that [he] saw." Summers "didn't hesitate," saying that "everything was exactly the same about him, except that . . . he was not wearing the hat." During the identification, Heard gave Summers the "same hard looks" he had given him earlier in the evening.

The next evening, Heard called his girlfriend from jail. The call was recorded. Heard told her that Summers would not have been able to identify him because he was not wearing his hat during the identification process.

During the investigation, police learned that the firearm belonged to Heard's cousin. When interviewed, the cousin said he kept the firearm in his basement and had not given Heard permission to take it. However, the cousin said Heard had visited the basement to "make music."

Before trial, the district court[1] denied Heard's motion to suppress Summers' eyewitness identification. The court also declined to give a jury instruction on eyewitness-identification testimony. At trial, the government introduced evidence including: (1) Summers' testimony; (2) the transcript of Heard's call to his girlfriend from jail; (3) the ownership of the firearm; (4) testimony of a cooperating witness that Heard had sold him a firearm, tried to sell him the firearm found at the scene, and possessed and offered to sell marijuana; and (5) testimony of Heard's girlfriend's mother that she gave him $10,300 to pay back loans for people who "want their money back," "are not messing around," and beat him up for failure to pay.

Heard moved for judgment of acquittal after the submission of the government's evidence stating, "[W]e would move for a judgment of acquittal. I

---

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

would focus on Count 4, the possession of a stolen firearm in this case." At the conclusion of all evidence, Heard renewed his motion, stating, "[T]he defendant would renew the motion, specifically as to Count 4, that's—that's the one that has controversy about it. There's certainly evidence on 1, 2, and 3, even though we would not say it's going to be sufficient, but I still think there is significant threshold problems that the government has on Count 4." The district court denied the motion.

After the government's closing argument, Heard's counsel informed the court that Heard himself wanted to deliver his closing argument. The court immediately excused the jury. Outside the presence of the jury, Heard's attorney reiterated that Heard "desires, demands, to present the closing argument in this case." His attorney advised him that he must "stay within the evidence that has been presented" and not "testify about things that have not been previously presented." He also advised that he "runs the risk that, if he goes outside those boundaries, that the Court could potentially strike his statement and not allow any sort of potential closing statement to be made by the defense in this case." The government responded, voicing "significant concerns based on his behavior yesterday after the Court repeatedly instructed him to stop doing things and he kept doing it, talking over counsel and talking over the Court."

The court then explained the procedure for closing argument. It warned Heard that if he violated orders, he would not be allowed to finish the closing argument. The court also cautioned him:

> Closing arguments are very important in a case, and they have to be delivered in a way that is convincing, courteous, civil, but persuasive. And [defense counsel] has gone to law school. He has appeared for defendants in my court for 15 years and other judges of this district. He knows what juries will believe and what they won't believe.

. . . .

-4-

I think that you are making a huge mistake, but the Constitution does guarantee you the right to make this closing argument if you want to.

. . . .

[The defendant] knows the ups and downs and apparently has made his own decision that this is what he wishes to do. And although I don't agree with his analysis of what's best for him, it's his life, so I will permit it, provided that he abide by the Court's rules.

The court then conducted an ex parte hearing with Heard and his attorney. His attorney said:

Certainly, I would say he's running a very significant risk by choosing to make his own closing argument. Mr. Heard, however, has frequently throughout my representation indicated his knowledge of the facts and circumstances. . . . [H]e certainly is well aware of the circumstances and facts of this particular matter, and he has that constitutional right.

The court concluded by asking, "And is it your desire, Mr. Heard, in fact, your demand, that you be permitted to make your own closing argument?" Heard answered, "Yes, ma'am. I just need about—yes, Your Honor. I just need maybe 10 minutes to just—to just get my delivery together." The court granted the request. Heard gave his closing argument. After the government's closing argument, Heard renewed his motion for judgment of acquittal, stating "We would again renew the motions previously made at the close of the evidence for a judgment of acquittal, especially as to Count 4." The court denied the motion.

The jury convicted Heard on all four counts. Heard did not renew his motion for judgment of acquittal. He appealed, challenging the conviction and arguing: (1) the district court erred in admitting eyewitness-identification evidence; (2) the district court abused its discretion in failing to instruct the jury on eyewitness identification;

(3) the trial violated his Sixth Amendment right to counsel; and (4) the evidence was insufficient to convict.

I.

Heard believes the district court erred in admitting Summers' eyewitness testimony. He complains the "show-up" identification was "clearly impermissibly suggestive" because officers called Summers back to the scene of the crime, asking him suggestive questions while Heard was handcuffed with a bright light shining "directly" on his face. This court reviews the denial of a motion to suppress de novo, but reviews "underlying factual determinations for clear error, giving due weight to the inferences of the district court and law enforcement officials." *United States v. Leon*, 924 F.3d 1021, 1025 (8th Cir. 2019).

"Police officers are not limited to station house line-ups if there is an opportunity for a quick, on-the-scene identification. Show-up identifications are essential to free innocent suspects and to inform the police if further investigation is necessary. Thus, even if the line-up is inherently suggestive, the line-up will be admissible as long as it is not impermissibly suggestive *and* unreliable." *United States v. Mitchell*, 726 F. Appx. 498, 501 (8th Cir. 2018) (cleaned up). *See generally Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) ("To be impermissibly suggestive, the procedure must give rise to a very substantial likelihood of irreparable misidentification." (internal quotation marks omitted)).

The show-up identification here was not impermissibly suggestive. "Necessary incidents of on-the-scene identifications, such as the suspects being handcuffed and in police custody" or having a light shone on their face "do not render the identification procedure impermissibly suggestive." *United States v. House*, 823 F.3d 482, 488 (8th Cir. 2016). *See United States v. Pickar*, 616 F.3d 821, 828 (8th Cir. 2010) (holding that a show-up identification was not unduly suggestive where

the defendant "was handcuffed and standing in front of a marked police cruiser," "stood between an officer in uniform and an officer in plainclothes," and "one of the officers [was] shining a small flashlight in [the defendant's] face").

The identification also was not unreliable. An identification is unreliable if the circumstances allow for "a very substantial likelihood of irreparable misidentification." *House*, 823 F.3d at 487. "The factors affecting reliability include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Sexton*, 138 S. Ct. at 2559 (internal quotation marks omitted). Here, Summers paid close attention to Heard due to the severe damage to his car. Summers observed him at a close distance, in good light, and "could see his face really good." Summers testified that Heard gave him "a threatening hard look" and "made it very clear that he didn't want us there." Only about an hour and a half passed between when Summers first saw Heard and when he made the identification.

The district court did not err in admitting the eyewitness identification. *Mitchell*, 726 F. Appx. at 502 (upholding the admission of a "show-up identification" where the witnesses "had the opportunity to observe" the defendant, "they were able to confidently identify him based on a distinctive outfit that he was wearing," and "little time elapsed" between the crime and the identification).

## II.

Heard maintains the district court abused its discretion in refusing to give Eighth Circuit Model Jury Instruction 4.08 Eyewitness Testimony on the "value of identification testimony." **Eighth Circuit Manual of Model Jury Instructions (Criminal) 4.08** (2018). This court reviews the refusal to submit a proffered jury instruction for abuse of discretion. *United States v. Waits*, 919 F.3d 1090, 1093 (8th

-7-

Cir. 2019). District judges have "wide latitude" in formulating jury instructions. *United States v. Amaya*, 731 F.3d 761, 771 (8th Cir. 2013). Jury instructions are sufficient "if they fairly and adequately submitted the issues to the jury." *Id.*

"It is reversible error for a trial court to refuse this specific jury instruction where the government's case rests solely on questionable eyewitness identification." *United States v. Mays*, 822 F.2d 793, 798 (8th Cir. 1987). Here, however, the government's case did not rely solely on the eyewitness identification. The evidence showed: (1) police found a firearm in the wooded area next to Heard's car; (2) the firearm belonged to Heard's cousin; (3) Heard had $340 in cash on him when arrested; (4) Heard had prior convictions for drug distribution and possession of firearms; and (5) Heard owed large sums of money to people who beat him up for failure to pay. "Although the district judge might well have given such an [eyewitness] instruction, in view of the other corroborating evidence of [the defendant's] guilt . . . the district court did not commit prejudicial error in refusing to do so." *Id. See United States v. Cain*, 616 F.2d 1056, 1058-59 (8th Cir. 1980) (affirming a conviction despite the lack of an eyewitness-identification instruction because the identification was corroborated by other testimony).

### III.

Heard argues his "right to counsel was violated when the district court permitted him to give his own closing argument without the proper colloquy."

The parties dispute the applicable standard of review. Heard contends review is de novo. *See United States v. Turner*, 644 F.3d 713, 720 (8th Cir. 2011) ("This court reviews de novo a district court's decision to allow a defendant to proceed pro se."). The government seeks plain error review because Heard "never filed a new trial motion asserting error in the district court's decision to grant his request to give his own closing argument." Alternatively, the government asserts this court should

-8-

review for abuse of discretion. *See United States v. Garrett*, 898 F.3d 811, 817 (8th Cir. 2018) ("The district court has broad discretion in controlling closing arguments, and we will not reverse absent an abuse of discretion."). This court need not decide which standard applies because Heard's claim fails under all of them.

Heard believes the district court did not "provide the proper colloquy for waiver of counsel." However, Heard did not fully waive his right to counsel. "A defendant does not have a constitutional right to simultaneously proceed pro se *and* with the benefit of counsel. However, district courts have discretion to permit 'hybrid representation' arrangements whereby a defendant takes over some functions of counsel despite being represented." *Fiorito v. United States*, 821 F.3d 999, 1003-04 (8th Cir. 2016) (cleaned up). As this court has explained:

> Such hybrid representation arrangements create significant problems in analyzing the issue of waiver of counsel. Where a defendant seeks to represent himself entirely without a lawyer, he must knowingly and intelligently waive his right to counsel. *Faretta*, 422 U.S. at 835, 95 S. Ct. 2525. However, courts of appeals analyzing hybrid representation arrangements have disagreed as to when a defendant's conduct triggers the waiver of his right to counsel. *Compare United States v. Leggett*, 81 F.3d 220, 224 (D.C. Cir. 1996) (holding that defendant in hybrid representation arrangement does not waive his right to counsel unless he makes "an articulate and unmistakable demand . . . to proceed *pro se*") *with United States v. Turnbull*, 888 F.2d 636, 638 (9th Cir. 1989) (holding that defendant must knowingly and intelligently waive his right to counsel before he assumes any of the "core functions" of counsel). Further, courts that have held that a waiver is necessary for hybrid representation have disagreed about what procedures are required before a defendant's waiver is knowing and intelligent. While some courts have required *Faretta* warnings any time a hybrid-represented defendant waives his right to counsel, *see, e.g.*, *United States v. Davis*, 269 F.3d 514, 518-20 (5th Cir. 2001), we have held that such warnings are not required when "the defendant had the required knowledge [about the

> dangers of proceeding *pro se*] from other sources." ***Yagow***, 953 F.2d at 431.

*Id.* at 1004. Like the defendant in *Fiorito*, Heard believes that "despite retaining counsel . . . the court was required to hold a *Faretta* hearing before granting his requests [to give his own closing argument] to ensure that his purported waiver of counsel was knowing and intelligent. . . . [B]ecause the court erred by failing to hold this hearing to warn him about the dangers of proceeding *pro se*, he was deprived of his Sixth Amendment right to counsel." *Id.*

This argument is without merit. Heard was represented by counsel who repeatedly advised him not to give his own closing argument. Because he "was represented by counsel and received counsel's advice, he did not waive his right to counsel, and the district court had no duty to conduct a *Faretta* hearing." *Id.* at 1005.

Even if construed as a waiver of his right to counsel, Heard's claim fails. "[N]either the Supreme Court nor this court has ever adopted a list of essential points that must be conveyed to a defendant in order for a waiver of counsel to be deemed knowing and voluntary." ***United States v. Tschacher***, 687 F.3d 923, 932 (8th Cir. 2012). "The adequacy of the waiver depends on the particular facts and circumstances of each case, including the background, experience, and conduct of the accused." *Id.* at 931. This court "will uphold a waiver of counsel absent specific warnings when the record as a whole demonstrates that the defendant knew and understood the disadvantages of self-representation." ***Fiorito***, 821 F.3d at 1006 (internal quotation marks omitted). "The record clearly shows that [Heard's] alleged waiver was knowing and intelligent." *Id.* The district court spoke with Heard at length about his request to give his own closing argument and made clear that the request was a "huge mistake." Heard's attorney also advised against the "significant risk" of delivering his own closing argument. The district court sufficiently apprised Heard of his right to counsel and of the possible consequences of forgoing that right.

-10-

## IV.

Heard contends there was insufficient evidence to convict on Counts 2 and 3 because the evidence did not show he possessed marijuana. When a defendant properly moves for judgment of acquittal in the district court, this court reviews de novo, "viewing the evidence and all reasonable inferences in the light most favorable to the jury's verdict." *United States v. Waloke*, 923 F.3d 1152, 1155 (8th Cir. 2019). Under this standard, a "judgment of acquittal" is appropriate "only when no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* However, when a defendant fails properly to move for judgment of acquittal in the district court, plain error review applies. *United States v. Calhoun*, 721 F.3d 596, 600 (8th Cir. 2013). "To demonstrate plain error, [defendant] must show (1) error, (2) that was plain, (3) that affects [his] substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

Heard asserts he moved for judgment of acquittal on all counts, and this court should review his claim de novo. The government disagrees, advocating plain error review. *Compare* **United States v. Huntley**, 523 F.3d 874, 875 (8th Cir. 2008) (reviewing for plain error where the defendant failed to filed a "post-verdict motion for judgment of acquittal"), *with* **United States v. Yarrington**, 634 F.3d 440, 449 (8th Cir. 2011) (reviewing de novo where the defendant moved for judgment of acquittal at the close of evidence but not after the verdict). This court need not decide the issue because Heard's claim fails under either standard.

Both Counts 2 and 3 required that Heard possess marijuana. The evidence showed: (1) Summers saw Heard throw two objects from his car into a nearby wooded area; (2) police found a firearm belonging to Heard's cousin and a distribution quantity of marijuana in the wooded area; (3) Heard has prior federal marijuana-related convictions; (4) Heard had $340 in cash on him when police arrested him; (5) Heard previously had sold firearms and offered to sell marijuana;

and (6) Heard owed large sums of money to people who beat him up for failure to pay. The bag of marijuana did not have Heard's fingerprints on it. However, law enforcement testified that this is common because "[d]rug packaging is one of the hardest items to find latent prints on." Similarly, the bag did not have Heard's DNA. But law enforcement testified that "no DNA tests were taken from that bag" because "the success [of] touch DNA on those types of items is extremely low." The lack of DNA and fingerprint evidence is not dispositive. *See, e.g.*, ***United States v. Porter***, 687 F.3d 918, 921 (8th Cir. 2012) (holding evidence was sufficient on a firearm conviction despite a "lack of fingerprints or DNA found on the firearm," and noting that examiners find "fingerprints on firearms" in only "three to five percent of cases"). Viewing the evidence most favorably to the verdict, there was sufficient evidence to show he possessed the marijuana. The district court did not err, let alone plainly err.[2]

\* \* \* \* \* \* \*

---

[2]In his reply, Heard argues the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019) requires dismissal of Count 1 because the jury was not instructed that the government was required to prove that Heard knew he was a convicted felon prohibited from possessing a firearm. *See* ***Rehaif v. United States***, 139 S. Ct. 2191, 2200 (2019) ("[I]n a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm."). Because Heard "failed to challenge the lack of a jury instruction regarding his knowledge of his felony status," this court reviews "his claim for plain error." ***United States v. Hollingshed***, 940 F.3d 410, 415 (8th Cir. 2019). Heard cannot satisfy elements three and four of the plain-error test. At trial, he admitted he pled guilty to the felonies of possession with intent to distribute marijuana and possession of firearms and served a term of imprisonment exceeding one year. "These facts . . . indicate that [Heard] knew he had been convicted of 'a crime punishable by imprisonment for a term exceeding one year.'" ***Id.*** at 416, *quoting* **18 U.S.C. § 922(g)(1)**. He thus cannot "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." ***Id.***

The judgment is affirmed.

_____