# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3547
_____

United States of America

*Plaintiff - Appellee*

v.

Hakeem Malik Dontae Flax, also known as Keem

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: November 17, 2020
Filed: February 25, 2021
_____

Before SHEPHERD, STRAS, and KOBES, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

A jury convicted Hakeem Malik Dontae Flax of conspiracy to distribute heroin, conspiracy to possess firearms in furtherance of a drug trafficking crime, and discharging a firearm in furtherance of a drug trafficking crime. Flax appeals, arguing that the evidence was insufficient to sustain his convictions and that the

district court[1] erred in allowing an expert witness to impermissibly opine on an ultimate issue in the case.  Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

"We recite the facts in the light most favorable to the jury's verdict."  United States v. Galloway, 917 F.3d 631, 632 (8th Cir. 2019) (citation omitted).

Flax was a member of the "1-9 Block Dipset Gang," a street gang that sells heroin in Minneapolis, Minnesota.  Members of the gang regularly carry firearms because they are engaged in rivalries with surrounding gangs, such as the Tre Tre Crips.  Members are assigned different roles within the gang.  Flax was a "shooter"; his job was to provide safety to the gang and its members and affirmatively seek out and eliminate rival gang members, referred to as "the opps" or "the opposition," using firearms.  See R. Doc. 306, at 192, 195-96, 239.  Flax additionally sold heroin from time to time.

In the early morning of August 5, 2017, Minneapolis Police Officer Andrew Schroeder observed Flax at a bar commonly referred to by the community as the "200 Club," where Officer Schroeder served as security.  Because the bar is frequented by the Tre Tre Crips, Officer Schroeder questioned Flax about his presence.  Flax responded that he was looking for someone, specifically "the opps."  Events escalated, and Flax engaged in a shootout with Shane Webb, a Tre Tre Crips member, in a parking lot outside the bar.  Webb died as a result of his gunshot wounds.

A grand jury indicted Flax and three other members of the 1-9 Block Dipset Gang with conspiring to possess firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(o); and conspiracy to distribute heroin, in violation

---

[1]The Honorable Wilhelmina M. Wright, United States District Court Judge for the District of Minnesota.

of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846. Flax was also individually charged with possession of ammunition as a felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2); and discharging a firearm in furtherance of a drug trafficking crime, in violation of id. § 924(c)(1)(A)(iii). Flax pled guilty to the charge of possession of ammunition as a felon and proceeded to trial on the three remaining counts.[2]

At trial, the government called Sergeant James Jensen of the Minneapolis Police Department (MPD). Sergeant Jensen testified to the shootout, referring to a video exhibit that was created using surrounding surveillance cameras. Officer Schroeder also testified about his interaction with Flax inside the 200 Club. The government then called Jovan Gentle and Kenneth Mack, two members of the community who were cooperating witnesses facing unrelated federal charges. Both individuals testified that the 1-9 Block Dipset Gang was involved in drug trafficking, specifically heroin. They also testified that Flax served the gang in a shooter role and occasionally sold heroin. The government then called Sergeant Jaclyn Tuma of the MPD. Sergeant Tuma had previously served six years in the Strategic Information Center of the MPD where she gathered information on North Minneapolis gangs, including the 1-9 Block Dipset Gang. Sergeant Tuma testified that Flax met seven of the nine-point criteria established by the Minnesota Violent Crime Coordinating Council to assess gang membership, indicating that Flax was a member of the 1-9 Block Dipset Gang. Sergeant Tuma then testified that gangs like the 1-9 Block Dipset Gang are organized by roles, such as "rappers," "shooters," and people "who can bring in specific resources." R. Doc. 307, at 388. She considered the 1-9 Block Dipset Gang to be a "drug trafficking organization" which used "shooters" to "reinforce[] the safety or perceived supremacy of the gang" in its drug operations. R. Doc. 307, at 388-90.

After the government rested, Flax moved for a judgment of acquittal on all counts, which the district court denied. Ultimately, the jury convicted Flax on all

---

[2]On appeal, Flax does not raise any issues related to his conviction for possession of ammunition as a felon.

counts. Based on these convictions and his prior guilty plea, the district court sentenced Flax to a total term of 220 months imprisonment.

## II.

Flax first contends that there was insufficient evidence to support his convictions for conspiracy to distribute heroin, conspiracy to possess firearms in furtherance of a drug trafficking crime, and discharging a firearm in furtherance of a drug trafficking crime. "We review 'the sufficiency of the evidence *de novo*, viewing evidence in the light most favorable to the jury's verdict, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict.'" United States v. King, 898 F.3d 797, 808 (8th Cir. 2018) (citation omitted). "We will overturn the verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id. "Therefore, even '[i]f the evidence adduced at trial rationally supports conflicting hypotheses, we [will] refuse to disturb the conviction.'" United States v. Wilson, 619 F.3d 787, 795 (8th Cir. 2010) (alterations in original) (citation omitted).

## A.

To convict an individual for conspiracy to distribute heroin, the government must prove: "(1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." United States v. Myers, 965 F.3d 933, 937 (8th Cir. 2020) (citation omitted). "An agreement to join a conspiracy need not be explicit and can be inferred from the facts of the case." United States v. Lewis, 895 F.3d 1004, 1009 (8th Cir. 2018) (citation omitted).

The government sufficiently proved that Flax conspired to distribute heroin. First, the evidence established that the 1-9 Block Dipset Gang is an organization that is engaged in drug distribution. Sergeant Tuma testified that she considered the gang to be a "drug trafficking organization." R. Doc. 307, at 388. Gentle testified that he

had known members of the gang for more than a decade, knew the gang to be involved in drug trafficking, and had even provided heroin to its members for distribution. R. Doc. 306, at 177-79. Mack additionally testified that the gang was engaged in "selling drugs" and "violence." R. Doc. 306, at 233. Second, evidence was presented that Flax was cognizant of and intentionally involved in the conspiracy. Flax identified himself as a member of the 1-9 Block Dipset Gang verbally, with hand signs, and with distinctive tattoos. Sergeant Tuma confirmed Flax's membership using the nine-point criteria established by the Minnesota Violent Crime Coordinating Council. Mack testified that he had seen Flax sell heroin. Furthermore, each of these three witnesses testified that the conspiratorial structure involved "shooters," whose job was to guarantee the safety and dominant reputation of the gang. Both Gentle and Mack testified that this was Flax's role in the 1-9 Block Dipset Gang, and Officer Schroeder's testimony revealed that Flax was operating within this role on the night of Webb's death as Flax was looking for "the opps." R. Doc. 306, at 138.

Flax largely points to the absence of direct evidence against him, arguing that other members of the gang did not testify against him or even to the existence of the conspiracy. He also notes that there were no controlled buys or wiretap evidence revealing that he sold heroin. However, the absence of this direct evidence does not undermine the jury's verdict. See United States v. Mickelson, 378 F.3d 810, 821 (8th Cir. 2004) ("Because the details of a conspiracy often are shrouded in secrecy, circumstantial evidence and inferences from the parties' actions may be used to establish the conspiracy's existence."); King, 898 F.3d at 808 ("[I]n evaluating the sufficiency of evidence to sustain a verdict, circumstantial evidence must be treated no differently than direct evidence." (alteration in original) (citation omitted)). Flax also attacks the credibility of the government's cooperating witnesses, Gentle and Mack, contending that their testimony lacked specificity as it related to the identities of gang members, dates and times, and quantities of drugs. But "we do not pass upon the credibility of witnesses or the weight to be given their testimony." United States v. Moua, 895 F.3d 556, 559 (8th Cir. 2018) (per curiam) (citation omitted) ("Credibility determinations are uniquely within the province of the trier of fact, and

are entitled to special deference." (citation omitted)). Further, "credibility determinations are resolved in favor of the verdict." United States v. Nickelous, 916 F.3d 721, 724 (8th Cir. 2019) (citation omitted). Accordingly, viewed in the light most favorable to the verdict, we find that there was sufficient evidence to support Flax's conviction for conspiracy to distribute heroin.

B.

To convict an individual of conspiracy to possess firearms in furtherance of a drug trafficking crime, the government must prove:

> (1) that there was a conspiracy, i.e., an agreement either to use or carry a firearm during and in relation to a drug trafficking crime or to possess a firearm in furtherance of a drug trafficking crime; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy.

United States v. Saddler, 538 F.3d 879, 889 (8th Cir. 2008). Here, the evidence discussed above supports this conspiracy conviction as well. Sergeant Tuma and Gentle and Mack testified that the 1-9 Block Dipset Gang used firearms and violence within their organization. Sergeant Tuma specifically noted that this aspect of the organization furthered its drug distribution purpose by "reinforc[ing] the safety or perceived supremacy of the gang." R. Doc. 307, at 389-90. Gentle and Mack testified that Flax was a shooter, and his role was to shoot "the opps." R. Doc. 306, at 192, 195-96, 239. Officer Schroeder testified that on the night in question, Flax stated that he was looking for "the opps." Webb was in fact an "opp" because he was a member of a rival gang, the Tre Tre Crips. Therefore, a reasonable jury could have found that members of the 1-9 Block Dipset Gang conspired to use firearms to further its drug operation and that Flax was intentionally involved with the conspiracy. Accordingly, we find that there was sufficient evidence to support Flax's conviction for conspiracy to possess firearms in furtherance of a drug trafficking crime.

C.

To convict an individual for discharging a firearm in furtherance of a drug trafficking crime, the government must prove: "(1) the use or carrying of a firearm; (2) during and in relation to a crime of violence or drug trafficking crime." United States v. Boman, 873 F.3d 1035, 1041 (8th Cir. 2017) (citing United States v. Rodriguez-Moreno, 526 U.S. 275, 280 (1999)). Flax first argues that there was insufficient evidence to establish the underlying drug trafficking crime (i.e., the conspiracy to distribute heroin or the conspiracy to possess firearms in furtherance of a drug trafficking crime). For the reasons stated above, we reject this argument.

Flax next contends that the evidence was insufficient to establish that he used a firearm "during and in relation to" the underlying drug conspiracies.[3] "The phrase 'in relation to' is expansive," but, "at a minimum, [it] clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime." Smith v. United States, 508 U.S. 223, 237-38 (1993), modified by, Bailey v. United States, 516 U.S. 137 (1995). "[The firearm's] presence or involvement cannot be the result of accident or coincidence. . . . Instead the gun at least must 'facilitat[e], or ha[ve] the potential of facilitating,' the drug trafficking offense." Id. at 238 (second and third alterations in original) (citation omitted).

"We have frequently observed that a firearm is a 'tool of the trade' for drug dealers . . . ." United States v. Regans, 125 F.3d 685, 686 (8th Cir. 1997). While the "temporal proximity between the carrying of a firearm and drug trafficking activity is important, a finding of temporal proximity or the lack thereof does not automatically establish or prohibit a finding of 'in relation to.'" United States v.

_____

[3]Flax does not challenge that his use of a firearm occurred "during" a drug trafficking crime, nor could he, as the discharge of the firearm took place during the timeframe of the conspiracy as defined in the indictment. Cf. United States v. Brown, 400 F.3d 1242, 1250 (10th Cir. 2005) (finding that § 924(c)'s "duration" requirement is satisfied when the firearm is "carried" at any point of an ongoing and continuous offense).

Bailey, 235 F.3d 1069, 1073 (8th Cir. 2000). Firearms are used in various aspects of drug trafficking schemes beyond merely facilitating drug transactions, such as "protect[ing] drugs and drug profits" and "intimidat[ing] drug customers, distributors and competitors." United States v. Gipp, 147 F.3d 680, 690 (8th Cir. 1998) (finding that the use of a firearm to intimidate customers of a prior drug transaction to prevent them from talking to law enforcement was "in relation to" a drug trafficking crime when it protected the defendant's drug activity); see also United States v. Brown, 400 F.3d 1242, 1251 (10th Cir. 2005) ("One recognized theory that explains how a gun facilitates a drug trafficking crime is that the gun deters interference with the crime." (citation omitted)). "If the presence of the firearm helps protect the supply of drugs and further the illegal activity, a § 924(c) conviction may be warranted." United States v. Jones, 990 F.2d 1047, 1049 (8th Cir. 1993).

Further, the members of drug trafficking organizations cannot evade the reach of a § 924(c) conviction simply because they have confined themselves to distinct roles, wherein some members are siloed from the actual drug transactions. At least two sister circuits have found that conduct similar to Flax's was within the reach of § 924(c). See United States v. Baptiste, 264 F.3d 578, 588 (5th Cir. 2001) (finding that the "attack[ on] a rival drug gang during the period of the conspiracy to retaliate for the murders of [other gang members]" was "in relation to" a drug trafficking crime when it "had at least the potential to protect the conspiracy and intimidate competitors and witnesses"), withdrawn in part on other grounds on reh'g, 309 F.3d 274 (5th Cir. 2002); United States v. Camps, 32 F.3d 102, 105-06 (4th Cir. 1994) (finding that the use of firearms in a gang war was "in relation to" a drug trafficking crime when it "occurred while the conspiracy was ongoing and as its members were attempting to defend themselves against, and thus preserve their drug operation from, violence at the hands of their rival"). Accordingly, when, as here, a member of a drug trafficking organization in fulfillment of his role as a shooter affirmatively seeks to eliminate rival gang members, the use of the firearm is "in relation to" the drug trafficking crime for purposes of § 924(c).

Here, there was sufficient evidence for a reasonable jury to find that Flax was furthering the conspiracy by protecting the 1-9 Block Dipset Gang's reputation and influence and thus the organization's ability to further its criminal enterprise. Sergeant Tuma testified that North Minneapolis gangs, such as the 1-9 Block Dipset Gang, used "shooters" to "reinforce[] the safety or perceived supremacy of the gang" in its drug operations. R. Doc. 307, at 388-90. Sergeant Tuma further testified that the role of a "shooter" involves "going out and looking for other gang members to try to catch them off guard." R. Doc. 307, at 389 ("They sort of go to historical areas and almost hunt out rival gang members as a way of asserting their social standing within the gang rivalry."). Gentle testified that "[a] shooter is the person that if he sees an opps of the gang, . . . he shoots at them" and clarified that "[t]he opps is the rival, a different gang that [a given gang] ha[s] a problem with." R. Doc. 306, at 196. Both Gentle and Mack testified that they witnessed Flax carrying a gun on multiple occasions and viewed his role within the gang to be a "shooter." R. Doc. 306, at 192, 195-96, 239. Finally, Officer Schroeder testified that Flax claimed he was at Club 200, rival gang territory, that night specifically looking for the "opps." R. Doc. 306, at 138. Therefore, we find that a reasonable jury could have found that Flax's shooting of Webb "had at least the potential to protect the conspiracy and intimidate competitors" such that his use of the firearm was "in relation to" the 1-9 Block Dipset Gang's drug trafficking activity. See Baptiste, 264 F.3d at 588.

Flax argues that the shooting could have involved motives outside of protecting the gang, such as self-defense, but the jury was permitted to accept or reject these theories at trial. Cf. Morse v. S. Union Co., 174 F.3d 917, 923 (8th Cir. 1999) ("It was the jury's function to consider the competing evidence and the competing views of that evidence."). And, common sense dictates that the use of a firearm against rival gang members may involve some element of self-defense. On appeal, we review the evidence in the light most favorable to the jury's verdict, and we will not disturb such verdict "even '[i]f the evidence adduced at trial rationally supports conflicting hypotheses.'" See Wilson, 619 F.3d at 795 (alteration in original) (citation omitted). Therefore, we conclude that there was sufficient

evidence to support Flax's conviction for discharging a firearm in furtherance of a drug trafficking crime.

## III.

Finally, Flax contends that the district court erred by allowing Sergeant Tuma to impermissibly opine on an ultimate issue when she testified that the 1-9 Block Dipset Gang is a "drug trafficking organization."[4] Flax concedes that he did not preserve this claim at trial[5]; therefore, we review for plain error. See United States v. House, 823 F.3d 482, 487 (8th Cir. 2016) ("When a defendant fails to object to the admission of evidence at trial, we review for plain error."). Accordingly, Flax "must prove that there was (1) error; (2) that was plain; and (3) that affects the substantial rights of the defendant." Id. Flax objects only to this one exchange:

> Q:  Now, you mentioned drugs. Do you consider [the 1-9 Block Dipset Gang] to be a drug trafficking organization?
>
> A:  Yes.

---

[4]An "ultimate issue" is "[a] not-yet-decided point that is sufficient either in itself or in connection with other points to resolve the entire case." Issue, Black's Law Dictionary (10th ed. 2014). While "[a]n opinion is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), experts generally cannot provide legal conclusions, see, e.g., Schmidt v. City of Bella Villa, 557 F.3d 564, 570 (8th Cir. 2009) (affirming the district court's exclusion of expert testimony when it opined on the reasonableness of a strip search procedure).

[5]Prior to trial, Flax filed a Motion in Limine to exclude the government "from introducing evidence of law enforcement 'experts.'" R. Doc. 177, at 1. However, the district court noted (and the parties agreed) that this motion was not ripe as Flax "[did] not identify the expert or any particular testimony that he challenge[d]" and denied the motion as premature. R. Doc. 204, at 8. Flax did not subsequently renew this motion nor did he contemporaneously object to Sergeant Tuma's testimony at trial.

Flax contends that this exchange impermissibly opined on an ultimate issue underlying each charge against him: whether the 1-9 Block Dipset Gang distributed heroin. We need not address whether the district court committed an error because Flax has not adequately shown that such error, if any, affected his substantial rights. See Molina-Martinez v. United States, 136 S. Ct. 1338, 1343 (2016) ("[I]n the ordinary case . . . [the defendant] must 'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." (citation omitted)). Sergeant Tuma also testified as to the organizational structure and history of the 1-9 Block Dipset Gang, including having members who bring in resources "such as money, drugs, or guns." R. Doc. 307, at 388. Further, both Gentle and Mack testified that the 1-9 Block Dipset Gang trafficked heroin. R. Doc. 306, at 178, 180, 233-34. Given the additional evidence of the 1-9 Block Dipset Gang's drug trafficking activity, we cannot say that there is a reasonable probability that the exclusion of this one exchange with Sergeant Tuma would have affected the outcome of Flax's proceedings. See United States v. Gilliam, 934 F.3d 854, 860 (8th Cir. 2019) ("[I]mproper admission of evidence which is cumulative of matters shown by admissible evidence is harmless error." (alteration in original) (citation omitted)).

IV.

The judgment of the district court is affirmed.

_____